**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

---

STATE OF RHODE ISLAND

       Plaintiff,

vs.

CHEVRON CORP.;
CHEVRON U.S.A. INC.;
EXXONMOBIL CORP.;
BP P.L.C.;
BP AMERICA, INC.;
BP PRODUCTS NORTH AMERICA, INC.;
ROYAL DUTCH SHELL PLC;
MOTIVA ENTERPRISES, LLC;
SHELL OIL PRODUCTS COMPANY LLC;
CITGO PETROLEUM CORP.;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
MARATHON PETROLEUM COMPANY LP;
SPEEDWAY LLC;
HESS CORP.;
LUKOIL PAN AMERICAS, LLC;
GETTY PETROLEUM MARKETING, INC.;
AND
DOES 1 through 100, inclusive,

       Defendants.

Case Number: 1:18-cv-00395-WES-LDA

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO REMAND TO STATE COURT**

[Removal from the Providence Superior Court of Rhode Island, C.A. No. PC-2018-4716]

---

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................... 1

II.   FACTS ................................................................................................................... 3

III.  APPLICABLE LEGAL STANDARDS ................................................................ 6

    A.  Defendants Bear the Burden to Defeat the Strong Presumption Against Removal Jurisdiction.................................................................................................... 6

    B.  Federal Defenses, Including Ordinary Preemption, Cannot Confer Subject-Matter Jurisdiction.................................................................................................... 8

IV.   REMOVAL TO STATE COURT IS REQUIRED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION........................................................................ 9

    A.  Federal Common Law Does Not Confer Subject-Matter Jurisdiction Over the State's Claims. ........................................................................................... 9

        1.  Defendants' Assertion that Federal Common Law "Governs" the State's Claims Raises an Ordinary Preemption Defense, and Nothing More........... 10

        2.  No Appellate Authority Holds That Tort Claims Related to Climate Change Must Be Exclusively Pleaded Under Federal Common Law........................ 12

        3.  Defendants' Cases Concerning Whether Federal Common Law "Governs" a Particular Subject Address Ordinary Preemption Defenses and Choice of Law, Not Removal Jurisdiction................................................................... 15

        4.  The State's Claims Fall Outside the Scope of Any Operative Federal Common Law in Any Event.......................................................................... 16

    B.  The State's Complaint Does Not Necessarily Raise Any Substantial, Disputed Federal Questions and Therefore Does Not "Arise Under" Federal Law. .............. 20

        1.  The State's Complaint Does Not "Necessarily Raise" Any "Actually Disputed" Issues of Federal Law. ............................................................... 21

        2.  Defendants Have Not Shown That the Complaint Raises Questions of Federal Law That Are "Substantial" to the Federal System as a Whole....... 26

        3.  Congress Has Struck the Balance of Judicial Responsibility in Favor of State Courts Hearing State Law Claims. ..................................................... 27

        4.  Defendants' Laundry List of Federal Defenses Does Not Provide Federal Jurisdiction. .................................................................................................. 28

        5.  Defendants' Invocation of Foreign Relations Is a Red Herring and Not a Basis for Federal Jurisdiction........................................................................ 29

        6.  Federal Laws Authorizing Regulation of Navigable Waters Do Not Confer *Grable* Jurisdiction............................................................................ 31

    C.  The Clean Air Act Does Not Completely Preempt the State's Claims. .................. 32

i

1.      Far from Indicating Congressional Intent to Completely Preempt State Law, the Clean Air Act Repeatedly Emphasizes the Primary Role of the States. . 34

2.      The Clean Air Act Does Not Create a Right of Action that Encompasses the State's Tort Claims. .................................................................................. 38

D.      The State's Complaint Does Not Fall Within the Jurisdictional Grant of the Outer Continental Shelf Lands Act.......................................................................... 39

E.      There Is No Enclave Jurisdiction Because the State's Claims Do Not "Arise" Within the Federal Enclave......................................................................................... 43

1.      The State's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands. ....................................................................................................... 43

2.      Each of the State's Claims Arose Only Once a Complete Tort Existed, Which in This Case Occurred When and Where the State Suffered Injury— on Non-Federal Lands. ................................................................................... 45

F.      The State's Claims Are Not Removable Under 28 U.S.C. § 1442(a)(1) Because Defendants Are Not "Acting Under Federal Officers." ........................... 47

1.      Defendants Have Not Shown They "Acted Under" Federal Officers........... 48

2.      No Causal Nexus Exists Between Defendants' Actions Challenged in This Case and the Directions of Any Federal Officer. ................................... 53

G.      The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C §§ 1452(a) and 1334. ................................................................................ 54

1.      The State Brings This Action Pursuant to Its Police and Regulatory Powers, and 28 U.S.C. § 1452(a) Expressly Does Not Apply to Police Power Actions. ............................................................................................. 54

2.      The State's Actions Are Not "Relate[d] to" Any Bankruptcy Case.............. 56

3.      Equity Demands That This Case Be Remanded to State Court. ................... 59

H.      There Is No Admiralty Jurisdiction, and Admiralty Jurisdiction Cannot Serve as a Ground for Removal .......................................................................................... 60

1.      Admiralty Jurisdiction Is Not a Basis for Removal. .................................... 60

2.      No Tort Has Caused Injury on Navigable Water, and No Vessel on Navigable Water Has Caused an Injury on Land. ........................................ 62

3.      The Claims Have No Substantial Relationship to Traditional Maritime Activity........................................................................................................ 63

V.      CONCLUSION ................................................................................................................. 64

## TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*,
527 U.S. 706 (1999)............................................................................................................ 7, 8

*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*,
134 F. Supp. 3d 1270 (D. Or. 2015) ...................................................................................... 18

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003)........................................................................................................ 31, 33

American Electric Power Co. v. Connecticut,
564 U.S. 410 (2011)..................................................................................................... passim

*Amoco Production Co. v. Sea Robin Pipeline Co.*,
844 F.2d 1202 (5th Cir. 1988) ............................................................................................... 43

*Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*,
*No. CV-12-RRA-1874-NE*, 2012 WL 12897212 (N.D. Ala. Dec. 6, 2012) .............................. 46

*Anversa v. Partners Healthcare Systems, Inc.*,
835 F.3d 167 (1st Cir. 2016)........................................................................................... 25, 26

*Ardente v. Brunswick Corp.*,
58 F. Supp. 3d 193 (D.R.I. 2014) .......................................................................................... 60

*Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*,
390 U.S. 557 (1968)........................................................................................................ 33, 39

*Averill v. Fiandaca*,
Case No. 2:17-cv-00287-JDL, 2017 WL 4419242 (D. Me. Oct. 5, 2017) .............................. 62

*Bader Farms, Inc. v. Monsanto Co.*,
No. 1:16-CV-299 SNLJ, 2017 WL 633815 (E.D. Mo. Feb. 16, 2017) ................................... 25

*Bailey v. Monsanto Co.*,
176 F. Supp. 3d 853 (E.D. Mo. 2016) ................................................................................... 54

*Barker v. Hercules Offshore, Inc.*,
713 F.3d 208 (5th Cir. 2013) .......................................................................................... 62, 64

*Bd. of Comm'rs of the Se. Louisiana Flood Prot Auth.-E. v. Tennessee Gas Pipeline Co.*,
850 F.3d 714, 720–21 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 420 (Oct. 30, 2017) ... 24, 25, 32

*Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*,
29 F. Supp. 3d 808 (E.D. La. 2014)...................................................................................... 44

*Bearse v. Port of Seattle*,
No. C09-0957RSL, 2009 WL 3066675 (W.D. Wash. Sept. 22, 2009) ................................... 34

*Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*,
770 F.3d 944 (10th Cir. 2014) ............................................................................................... 23

*Bell v. Arvin Meritor, Inc.*,
No. 12-00131-SC, 2012 WL 1110001 (N.D. Cal. Apr. 2, 2012)............................................ 46

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) .................................. 34, 36

*Beneficial Nat'l Bank v. Anderson*,
   539 U.S. 1 (2003) .............................................................................................................. 33, 38

*Bennett v. Napolitano*,
   746 A.2d 138 (R.I. 2000) ......................................................................................................... 22

*Bennett v. Sw. Airlines Co.*,
   484 F.3d 907 (7th Cir. 2007) .................................................................................................. 23

*BIW Deceived v. Local S6, Ind. Union of Marine & Shipbuilding Workers of Am.*,
   132 F.3d 824 (1st Cir. 1997) ..................................................................................................... 7

*Bordetsky v. Akima Logistics Servs., LLC*,
   No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D.N.J. Feb. 16, 2016) .................................. 46

*Boudreaux v. Glob. Offshore Res., LLC*,
   No. CIV.A. 14-2507, 2015 WL 419002 (W.D. La. Jan. 30, 2015) ......................................... 62

*Boyle v. United Technologies Corp.*,
   487 U.S. 500 (1988) .......................................................................................................... 15, 17

*Brooklyn Union Expl. Co. v. Tejas Power Corp.*,
   930 F. Supp. 289 (S.D. Tex. 1996) ......................................................................................... 42

*Brown v. Porter*,
   149 F. Supp. 3d 963 (N.D. Ill. 2016) ...................................................................................... 62

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ................................................................................................................. 25

*California ex rel. Brown v. Villalobos*,
   453 B.R. 404 (D. Nev. 2011) ................................................................................................... 56

*California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. Hardesty Sand & Gravel*,
   No. 2:11-CV-02278 JAM, 2012 WL 639344 (E.D. Cal. Feb. 24, 2012) ................................ 34

*California v. Gen. Motors Corp.*,
   No. C06-05755 MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ..................................... 33

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
   824 F.3d 1156 (9th Cir. 2016) ................................................................................................. 15

*Camacho v. Authoridad de Teléfonos de Puerto Rico*,
   868 F.2d 482 (1st Cir. 1989) ................................................................................................... 51

*Caterpillar Inc. v. Williams*,
   482 U.S. 386 (1987) ....................................................................................................... 7, 8, 33

*Cerny v. Marathon Oil Corp.*,
   No. CIV.A. SA-13-CA-562, 2013 WL 5560483 ...................................................................... 34

*Chevron U.S.A., Inc. v. United States*,
   110 Fed. Cl. 747 (2013) ........................................................................................................... 52

*Citizens for Preservation of Waterman Lake v. Davis*,
   420 A.2d 53 (R.I. 1980) ........................................................................................................... 22

iv

*City & Cty. of San Francisco v. PG & E Corp.*,
433 F.3d 1115 (9th Cir. 2006) ........................................................................................ 55

*City of Milwaukee v. Illinois & Michigan*,
451 U.S. 304 (1981) ............................................................................................ 14, 15, 16

*City of New York v. BP P.L.C.*,
No. 18 CIV. 182 (JFK), 2018 WL 3475470 (S.D.N.Y. July 19, 2018) ..................................... 12

*City of Oakland v. BP p.l.c.*,
No. C 17-06011 WHA, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) ........................ 11, 32, 63

*City of Oakland v. BP P.L.C.*,
No. C 17-06011 WHA, 2018 WL 3109726 (N.D. Cal. June 25, 2018) ................................. 33

*Collier v. District of Colum*bia,
46 F. Supp. 3d 6 (D.D.C. 2014) ...................................................................................... 45

*Coronel v. AK Victory*,
1 F. Supp. 3d 1175 (W.D. Wash. 2014) .................................................................. 60, 61, 62

*Corporación Para el Desarrollo del Oeste, Inc.*,
726 F.3d 8 (1st Cir. 2013) .............................................................................................. 26

*Counts v. Gen. Motors, LLC*,
237 F. Supp. 3d 572 (E.D. Mich. 2017) ........................................................................... 20

*Cruz v. DaimlerChrysler Motors Corp.*,
66 A.3d 446 (R.I. 2013) ........................................................................................... 22, 47

*CTS Corp. v. Waldburger*,
134 S. Ct. 2175 (2014) ................................................................................................... 35

*Cty. of San Mateo v. Chevron Corp.*,
294 F. Supp. 3d 934 (N.D. Cal. 2018) ...................................................................... passim

*Danca v. Private Health Care Sys., Inc.*,
185 F.3d 1 (1st Cir. 1999) ................................................................................................. 7

*E.P.A. v. EME Homer City Generation, L.P.*,
134 S. Ct. 1584 (2014) ................................................................................................... 35

*Empire Healthchoice Assur., Inc. v. McVeigh*,
547 U.S. 677 (2006) .......................................................................................... 21, 26, 32

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ....................................................................................................... 36

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
26 F.3d 563 (5th Cir. 1994) ............................................................................................ 40

*Exxon Mobil Corp. v. Allapattah Servs.*,
545 U.S. 546 (2005) ......................................................................................................... 6

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) ....................................................................................................... 56

*Fairfield Indus., Inc. v. EP Energy E&P Co.*,
2013 WL 12145968 (S.D. Tex. May 2, 2013) ................................................................... 42

v

*Faulk v. Owens-Corning Fiberglass Corp.*,
  48 F. Supp. 2d 653 (E.D. Tex. 1999)......................................................................... 50

*Fayard v. Ne. Vehicle Servs., LLC*,
  533 F.3d 42 (1st Cir. 2008) ............................................................................... 11, 39

*Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*,
  No. CIV.A. 11-10952-GAO, 2012 WL 769731 (D. Mass. Mar. 9, 2012)................................ 60

*Ford v. Murphy Oil U.S.A., Inc.*,
  750 F. Supp. 766 (E.D. La. 1990)............................................................................ 34

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983)....................................................................................... passim

*Freeman v. Grain Processing Corp.*,
  848 N.W.2d 58 (Iowa 2014) ................................................................... 14, 24, 34, 39

*Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*,
  245 F. Supp. 2d 1144 (D. Colo. 2002)....................................................................... 48

*Fung v. Abex Corp.*,
  816 F. Supp. 569 (N.D. Cal. 1992) .......................................................................... 46

*Gingery v. City of Glendale*,
  831 F.3d 1222 (9th Cir. 2016) .............................................................................. 30

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
  545 U.S. 308 (2005)................................................................................... passim

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) .......................................................................... 18

*Gully v. First Nat'l Bank*,
  299 U.S. 109 (1936)......................................................................................... 8

*Gunn v. Minton*,
  568 U.S. 251 (2013)...................................................................... 11, 20, 21, 26

*Gutierrez v. Mobil Oil Corp.*,
  798 F. Supp. 1280 (W.D. Tex. 1992) ........................................................................ 34

*Healy v. Ratta*,
  292 U.S. 263 (1934)......................................................................................... 6

*Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*,
  874 F.2d 332 (6th Cir. 1989) ........................................................................... 34, 38

*Herb's Welding, Inc. v. Gray*,
  470 U.S. 414 (1985)....................................................................................... 64

*Herreshoff v. Tripp*,
  23 A. 104 (R.I. 1885)...................................................................................... 47

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)........................................................................................ 30

*Hobson v. Hansen*,
  265 F. Supp. 902 (D.D.C. 1967)............................................................................. 45

vi

*Humble Pipe Line Co. v. Waggonner*,
  376 U.S. 369 (1964)........................................................................................ 44

*Illinois v. City of Milwaukee, Wis.*,
  406 U.S. 91 (1972).......................................................................................... 11

*In re Agent Orange Prod. Liab. Litig.*,
  635 F.2d 987 (2d Cir. 1980) .......................................................................... 19

*In re Boston Reg'l Med. Ctr., Inc.*,
  410 F.3d 100 (1st Cir. 2005)..................................................................... 57, 58

*In re Deepwater Horizon*,
  745 F.3d 157 (5th Cir. 2014) ............................................................... 40, 41, 42

*In re Enivid, Inc.*,
  364 B.R. 139 (Bankr. D. Mass. 2007) ........................................................... 57

*In re McCarthy*,
  230 B.R. 414 (B.A.P. 9th Cir. 1999) ............................................................. 59

*In re McMullen*,
  386 F.3d 320 (1st Cir. 2004)..................................................................... 55, 56

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  488 F.3d 112 (2d Cir. 2007) ........................................................ 28, 51, 54, 56

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) ................................................................. 19, 36, 38

*In re Ray*,
  624 F.3d 1124 (9th Cir. 2010) ............................................................. 57, 58, 59

*In re Santa Clara Cty. Child Care Consortium*,
  223 B.R. 40 (B.A.P. 1st Cir. 1998)........................................................... 57, 59

*In re Spookyworld, Inc.*,
  346 F.3d 1 (1st Cir. 2003)............................................................................. 55

*In re Texaco Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. Mar. 23, 1988) ............................................. 58

*In re Universal Life Church*,
  128 F.3d 1294 (9th Cir. 1997) ....................................................................... 56

*In re Vioxx Prods. Liab. Litig.*,
  843 F. Supp. 2d 654 (E.D. La. 2012)............................................................ 23

*International Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)................................................................................. 15, 37

*Jackson v. Johns-Manville Sales Corp.*,
  750 F.2d 1314 (5th Cir. 1985) ...................................................................... 19

*Jacobsen v. U.S. Postal Service*,
  993 F.2d 649 (9th Cir. 1992) ........................................................................ 45

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995)............................................................................. 60, 62, 63

*Jet Aviation, Inc. v. City of Cleveland, Ohio*,
  409 U.S. 249 (1972)..................................................................................... 64

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
  653 F.3d 1024 (9th Cir. 2011) .................................................................... 23

*Keltner v. SunCoke Energy, Inc.*,
  No. 3:14-CV-01374-DRHPMF, 2015 WL 3400234 (S.D. Ill. May 26, 2015)......................... 34

*Kieff v. La. Land & Expl. Co.*,
  1997 WL 627563 (E.D. La. Oct. 9, 1997) .................................................... 32

*Kirk v. Palmer*,
  No. Civ. A 97-2587, 19 F. Supp. 3d 707 (S.D. Tex. 2014) ...................................... 23

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
  754 F.2d 1223 (5th Cir. 1985) .................................................................... 43

*LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*,
  No. CIVA 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007) ......................... 42

*Louisville & Nashville R.R. Co. v. Mottley*,
  211 U.S. 149 (1908)..................................................................................... 8

*Lu Junhong v. Boeing Co.*,
  792 F.3d 805 (7th Cir. 2015) ...................................................................... 62

*Lupez-Munoz v. Triple-S Salud, Inc.*,
  754 F.3d 1 (1st Cir. 2014)........................................................................... 8

*Madruga v. Superior Court of State of Cal.*,
  346 U.S. 556 (1954)..................................................................................... 61

*Massachusetts v. New England Pellet, LLC*,
  409 B.R. 255 (D. Mass. 2009) ............................................................... 55, 56

*Merrell Dow Pharm. Inc. v. Thompson*,
  478 U.S. 804 (1986)..................................................................................... 27

*Merrick v. Diageo Americas Supply, Inc.*,
  805 F.3d 685 (6th Cir. 2015) ........................................................... 14, 19, 34

*Mesa v. California*,
  489 U.S. 121 (1989)............................................................................. 48, 54

*Messerlian v. A.O. Smith Corp.*,
  No. C.A. 09-393 S (WES) (LDA), 2010 WL 308981 (D.R.I. Jan. 25, 2010) ........................ 59

*Messier v. Ace Am. Ins. Co.*,
  No. 12-cv-892-JD, 2013 WL 5423716 (D.R.I. Sept. 28, 2013) ............................... 61

*Metro. Life Ins. Co. v. Taylor*,
  481 U.S. 58 (1987)................................................................................. passim

*Meyers v. Chesterton, No. CIV.A.*,
  15-292, 2015 WL 2452346 (E.D. La. May 20, 2015) ........................................ 54

*Mississippi River Fuel Corp. v. Cocrehan*,
  390 F.2d 34 (5th Cir. 1968) ....................................................................... 44

*Mobley v. Cerro Flow Prod., Inc.*,
  No. CIV 09-697-GPM, 2010 WL 55906 (S.D. Ill. Jan. 5, 2010) .............................................. 48

*Morrison v. Drummond Co.*,
  No. 2:14-cv-0406-SLB, 2015 WL 1345721 ............................................................................. 34

*Myhran v. Johns-Manville Corp.*,
  741 F.2d 1119 (9th Cir. 1984) ................................................................................................. 64

*N.C. ex rel. Cooper v. Tennessee Valley Authority*,
  615 F.3d 291 (2010)........................................................................................................... 37, 38

*Nat'l Audubon Soc'y v. Dep't of Water*,
  869 F.2d 1196 (9th Cir. 1988) ................................................................................................. 19

*National Farmers Union Insurance Companies v. Crow Tribe of Indians*,
  471 U.S. 845 (1985)................................................................................................................... 16

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
  663 F. Supp. 2d 863 (N.D. Cal. 2009) ..................................................................................... 13

*Native Village of Kivalina v. ExxonMobil Corp.*,
  696 F.3d 849 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2390 (2013)............................... 9, 13, 14

*Nevada v. Bank of Am. Corp.*,
  672 F.3d 661 (9th Cir. 2012) ................................................................................................. 2, 7

*OCS, Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*,
  64 F. Supp. 3d 872 (E.D. La. 2014).................................................................................... 40, 42

*Ohio ex rel. Skaggs v. Brunner*,
  549 F.3d 468 (6th Cir. 2008) ................................................................................................... 29

*Oregon ex rel. Kroger v. Johnson & Johnson*,
  832 F. Supp. 2d 1250 (D. Or. 2011) ........................................................................................ 22

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
  559 F.3d 772 (8th Cir. 2009) ................................................................................................... 25

*Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co.*,
  46 F. Supp. 3d 701 (S.D. Tex. 2014)................................................................................... 40, 41

*Portland Pipe Line Corp. v. City of S. Portland*,
  288 F. Supp. 3d 321 (D. Me. 2017) ......................................................................................... 30

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
  582 F.3d 1083, 1091 (9th Cir. 2009) ....................................................................................... 30

*R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt.*,
  585 F.3d 42 (1st Cir. 2009)................................................................................................... 7, 10

*Rafter v. Stevenson*,
  680 F. Supp. 2d 275 (D. Me. 2010) ......................................................................................... 61

*Raimbeault v. Takeuchi Mfg. (U.S.) Ltd.*,
  772 A.2d 1056 (R.I. 2001)........................................................................................................ 22

*Recar v. CNG Producing Co.*,
  853 F.2d 367 (5th Cir. 1988) ................................................................................................... 41

*Renaud v. Sigma-Aldrich Corp.*,
  662 A.2d 711 (R.I. 1995) .................................................................................................. 47

*Resolution Trust Corp. v. Gladstone*,
  895 F. Supp. 356 (D. Mass. 1995) ..................................................................................... 16

*Ritter v. Narragansett Elec. Co.*,
  283 A.2d 255 (R.I. 1971) .................................................................................................. 47

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) .......................................................................................... 18

*Romero v. Int'l Terminal Operating Co.*,
  358 U.S. 354 (1959) ..................................................................................................... 61, 62

*Rosselló-González v. Calderón-Serra*,
  398 F.3d 1 (1st Cir. 2004) ................................................................................................... 7

*Rubber Co. v. Buckeye Egg Farm, L.P.*,
  No. 2:99-CV-1413, 2000 WL 782131 (S.D. Ohio June 16, 2000) ..................................... 34

*Rush Prudential HMO, Inc. v. Moran*,
  536 U.S. 355 (2002) .......................................................................................................... 35

*Ryan v. Hercules Offshore, Inc.*,
  945 F. Supp. 2d 772 (E.D. Tex. 2013) ............................................................................... 62

*Sam L. Majors Jewelers v. ABX, Inc.*,
  117 F.3d 922 (5th Cir. 1997) ............................................................................................. 33

*Sanders v. Cambrian Consultants*,
  132 F. Supp. 3d 853 (S.D. Tex. 2015) ............................................................................... 62

*Shanks v. Dressel*,
  540 F.3d 1082 (9th Cir. 2008) .......................................................................................... 23

*Sheehan v. Broadband Access Servs., Inc.*,
  889 F. Supp. 2d 284 (D.R.I. 2012) ...................................................................................... 6

*Shepherd v. Air & Liquid Sys. Corp.*,
  No. CA 12-143L, 2012 WL 5874781 (D.R.I. Nov. 20, 2012) ............................................ 48

*Shulthis v. McDougal*,
  225 U.S. 561 (1912) .......................................................................................................... 21

*Sparling v. Doyle*,
  No. EP-13-CV-00323-DCG, 2014 WL 2448926 (W.D. Tex. May 30, 2014) ........................ 46

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*,
  774 F. Supp. 2d 596 (D. Del. 2011) ................................................................................... 42

*T & K Asphalt Servs., Inc. v. DDRC Gateway, LLC*,
  976 F. Supp. 2d 38 (D. Mass. 2013) .................................................................................. 58

*Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*,
  87 F.3d 150 (5th Cir. 1996) ............................................................................................... 62

*Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*,
  448 F.3d 760 (5th Cir. 2006) ............................................................................................. 64

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981).................................................................................... 17

*Totah v. Bies*,
  No. C 10-05956 CW, 2011 WL 1324471 (N.D. Cal. Apr. 6, 2011)................................... 45, 47

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
  899 F.2d 405 (5th Cir. 1990) ..................................................................... 43

*United States v. Hooker Chems. & Plastics Corp.*,
  722 F. Supp. 960 (W.D.N.Y. 1989) ............................................................... 28

*United States v. Pink*,
  315 U.S. 203 (1942)................................................................................ 30

*United States v. Standard Oil Co. of Cal.*,
  545 F.2d 624 (9th Cir. 1976) ..................................................................... 52

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009).................................................................................. 8

*W. Virginia ex rel. McGraw v. Eli Lilly & Co.*,
  476 F. Supp. 2d 230 (E.D.N.Y. 2007) ........................................................... 25

*Washington v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wash. 2017)....................................................... 44

*Watson v. Philip Morris Cos., Inc.*,
  551 U.S. 142 (2007).......................................................................... passim

*Wayne v. DHL Worldwide Express*,
  294 F.3d 1179 (9th Cir. 2002) ................................................................... 33

*Weida v. Ferry*,
  493 A.2d 824 (R.I. 1985)......................................................................... 47

*Wendella Sightseeing Co. v. Blount Boats, Inc.*,
  C.A. No. 17-388 (WES), 2018 WL 1620925 (D.R.I. Mar. 30, 2018) ......................... 22

*West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
  646 F.3d 169 (4th Cir. 2011) ..................................................................... 7

*Winters v. Diamond Shamrock Chem. Co.*,
  149 F.3d 387 (5th Cir. 1998) ..................................................................... 51

**Statutes**

28 U.S.C. § 362................................................................................... 55

28 U.S.C. § 1331................................................................................ 9, 16

28 U.S.C. § 1333............................................................................ 60, 61, 62

28 U.S.C. § 1334................................................................................ 54, 56

28 U.S.C. § 1441............................................................................ 60, 61, 62

28 U.S.C. § 1442.......................................................................... passim

28 U.S.C. § 1447................................................................................. 3

28 U.S.C. § 1452 ............................................................................................... 54, 55, 56, 59

30 U.S.C. § 1255 ..................................................................................................................... 28

30 U.S.C. § 1270 ..................................................................................................................... 28

30 U.S.C. § 21a ....................................................................................................................... 28

42 U.S.C. § 1983 ..................................................................................................................... 45

42 U.S.C. § 5801 ..................................................................................................................... 28

42 U.S.C. § 7401 ......................................................................................................... 27, 35, 36

42 U.S.C. § 7416 ......................................................................................................... 19, 27, 36

42 U.S.C. § 7604 ......................................................................................................... 27, 36, 39

43 U.S.C. § 1349 ............................................................................................................... 39, 40

46 U.S.C. § 30101 ................................................................................................................... 63

Cal. Health & Safety Code § 38501 *et seq*. (Ca. Global Warming Solutions Act of 2006) ......... 17

Pub. L. No. 112-63, 125 Stat. 758 ......................................................................................... 61

R.I. Gen. Laws § 10-20-1 ........................................................................................................ 22

R.I. Gen. Laws § 9-1-13 .......................................................................................................... 46

**Regulations**

Or. Admin. R. 340-253-000 (Oregon Clean Fuels Program) ...................................................... 18

R.I. Code R. 25-4-46 ............................................................................................................... 17

**Other Authorities**

Restatement Torts 2d § 402(A) ................................................................................................. 47

R.I. Const., art. I, § 17 ............................................................................................................. 22

U.S. Const. art. III, § 2, cl. 1 ................................................................................................... 60

## I.        INTRODUCTION

Climate change has come to the Ocean State, causing ruinous harm that worsens daily. Rising seas batter the coastline. Hurricanes and severe winter storms have become more frequent, longer-lasting, more extreme, and more volatile. Extreme heat, extreme drought, and extreme precipitation all impact the State in significant and increasing ways as time goes on. These effects result directly from the Defendants' tortious over-promotion, over-marketing, and resulting sales of massive quantities of fossil fuels despite knowing for more than fifty years that their actions would cause devastation to the State. The State seeks to vindicate these harms through application of Rhode Island state law.

This motion presents a straightforward question: whether a federal court may retain jurisdiction over a sovereign State's complaint alleging only state law causes of action to right a wrong done to the State and its citizens by private corporate defendants, on removal from the State's own courts. For the reasons set forth below, the answer here is no. As the Northern District of California recently recognized in remanding cases brought by California municipalities alleging state law causes of action for climate change-related injuries:

> to justify removal from state court to federal court, a defendant must be able to show that the case being removed fits within one of a small handful of small boxes. Because these cases do not fit within any of those boxes, they were properly filed in state court and improperly removed to federal court.

*Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 939 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. Mar. 27, 2018) ("*San Mateo*").

Defendants' Notice of Removal, presenting the same arguments raised in *San Mateo*, misrepresents the substance of the State's claims—which seek money damages and equitable abatement of the effects of climate change within the state of Rhode Island under Rhode Island law to mitigate harm from the changes to Rhode Island's environment—and wrongly portrays

them as seeking to halt, or at least to usurp control over, all greenhouse gas emissions and fossil fuel use worldwide. Defendants' theories of removal have nothing to do with the allegations and claims in the Complaint, and everything to do with preventing Rhode Island from protecting itself from the real, local damages inflicted by Defendants. The Supreme Court has long recognized the fundamental principle of federal question jurisdiction that:

> [Under] the century-old jurisdictional framework governing removal of federal question cases from state into federal courts, . . . a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law. The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts.

*Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (citations omitted). There is no federal question presented in the Complaint's state law causes of action. And none of the state law claims presents an "embedded" federal question under the narrow test for removal articulated in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005) ("*Grable*"). Here, especially, where a sovereign State has elected to bring claims in its own courts under its own laws, any ambiguity should be resolved in favor of respecting the sovereign's choice of forum, and remand should be granted. *See Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012).

Defendants' further attempt to shoehorn a federal common law cause of action into the Complaint also fails. Even assuming federal common law "controls" (which it does not), it could only arise as a federal law defense and cannot provide a jurisdictional basis to support removal. Defendants' further efforts to invoke "complete preemption" under the federal Clean Air Act (the "Act") conflicts with the text, context, structure, and purpose of the Act, and likewise provides no basis for removal jurisdiction. Defendants fail to acknowledge that the Act explicitly emphasizes

2

the primary role of states in addressing air pollution and ignore the extensive case law holding that the Act does not preempt state law causes of action such as these.

Additionally, Defendants' arguments premised on fossil fuel extraction on the Outer Continental Shelf, in a federal enclave, or at the direction of a federal officer have no foundation in the Complaint, the facts, or the law. The focus of the State's allegations are injuries from the defective nature of Defendants' fossil fuel products, from Defendants' injection of those products into the marketplace without sufficient warnings of their known dangers, and from the over-promotion, over-marketing, and deliberate campaigns of misinformation that undermined public understanding of those dangers. The location of the extraction of these fuels is irrelevant to the success or failure of the State's Complaint, and any contractual relationship with an actual federal officer is unconnected to Defendants' tortious conduct or the ability to obtain relief through the Rhode Island Superior Court. Because the State's claims arise out of the exercise of its police power to protect the public interest, there is no basis for removal based on bankruptcy. Finally, even if the State's claims arose out of admiralty, which they do not, state law admiralty claims brought in state court are not removable.

Defendants fail to establish the Constitutionally irreducible necessity that subject-matter jurisdiction exist to support removal. The State respectfully requests that this Honorable Court grant its motion to remand, pursuant to 28 U.S.C. § 1447, and properly return this case to the Rhode Island Superior Court.

## II. FACTS

The State of Rhode Island sued Defendants—21 companies that produce, market, promote, and sell fossil fuels—in Providence Superior Court for damages and equitable relief associated with injuries the State has sustained and will sustain as a result of climate change. Doc. No. 1 (June

13, 2018) ("Not. of Rem."), Ex. A ("Compl.") ¶¶ 225–315.[1] Defendants filed their notice of removal asserting seven separate grounds for federal court jurisdiction (*see generally*, Not. of Rem.), and Defendant Marathon Petroleum Company LP ("Marathon") filed a supplemental notice of removal asserting two additional grounds. *See* Doc. No. 15 (July 20, 2018) ("Supp. Not. of Rem.").

Defendants have known for nearly 50 years that their oil, gas, and coal products create greenhouse gas pollution that warms the oceans, changes our climate, and causes sea levels to rise. ¶¶ 1, 5, 147–177. They were so certain of this conclusion that some took steps to protect their own assets from rising seas and more extreme storms, and they developed new technologies to profit from a warming world. ¶¶ 5, 178–83. Despite this knowledge, Defendants engaged for decades in a coordinated, multi-front effort to conceal and contradict their own knowledge, discredit the growing body of publicly available science, and persistently create doubt in the minds of customers, consumers, regulators, and the media. ¶¶ 147–77. Their own scientists warned in the 1970s that a narrowing window of time remained before "hard decisions regarding changes in energy strategy might become critical." ¶ 116. Defendants launched multi-million-dollar public relations campaigns to prevent regulation by denying the truth and deceiving the public and policymakers, while continuing to market and promote their products aggressively to increase production and profits. ¶ 173.

The Defendants here are responsible by themselves for a substantial share of all industrial carbon dioxide emissions between 1965 and 2015, a critical period known to scientists as the "Great Acceleration," during which the vast majority of all such emissions in human history have

---

[1] Unless otherwise noted, all paragraph symbols (¶) in this Section refer to paragraphs so numbered in the State's Complaint.

occurred. ¶¶ 4, 7, 44–46. Industrial carbon dioxide emissions—that is, emissions from the use of coal, oil, and gas—are the dominant factor in the expansion of the oceans, melting of land-based glaciers, and loss of the polar ice caps, all of which are the dominant factors contributing to sea level rise. ¶¶ 47–51. The frequency of extreme sea level events has correspondingly increased with the acceleration of industrial emissions. ¶¶ 47–61. Industrial carbon dioxide has increased mean air temperatures, resulting in extreme high temperatures and heat waves; disrupted the hydrologic cycle resulting in increased extreme precipitation events, including cyclones, floods, and drought; and contributed to ocean acidification, which affects the suitability of marine waters for aquatic life traditionally found off the State's coast. ¶¶ 63–69, 72–79, 81–87. As a result of these climate change impacts, Rhode Island and its citizens have been injured. ¶¶ 8, 197–224. The impacts on the State, already serious, will substantially worsen. Even if all emissions from fossil fuel use ceased today, sea levels would continue to rise and other impacts of climate change would continue to accelerate due to greenhouse gases already emitted. ¶ 186.

The primary source of industrial carbon dioxide emissions is the extraction, production, and consumption of fossil fuel products—coal, oil, and natural gas. ¶ 3. The State's injuries arise from the defective nature of those fossil fuel products manufactured, marketed, and sold by Defendants; Defendants' knowledge of the dangerous effects of their products; Defendants' injection of those products into the stream of commerce without sufficiently warning of those known dangers; and Defendants' campaign of misinformation that undermined public understanding of those dangers. ¶¶ 225–315.

The State's claims are brought exclusively under Rhode Island law. The state law claims include public nuisance, product liability (failure to warn and defective design), negligence, trespass, impairment of public trust resources, and violation of the State Environmental Rights Act

5

arising out of injuries to State resources sustained within the State's borders. ¶¶ 225-315. The State does not seek to nullify or modify any permit issued under state or federal law; nor to affect any greenhouse gas regulation, law, or treaty, foreign or domestic; it certainly does not, contrary to defendants' arguments, "seek to regulate nationwide emissions that . . . conform to EPA's emission standard" (Not. of Rem. ¶ 45); nor does it "see[k] to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States" (*id.* ¶ 33). In fact, "Rhode Island does not seek to impose liability on Defendants for harms other than those to the State." ¶ 12. Rather, the State seeks damages and costs of abatement—i.e., the costs of adaptation and mitigation measures within its geographic boundaries, even expressly excluding measures that may be required on federal lands in the State—for harms caused by Defendants' conduct. ¶¶ 1 n.2, 197–315, Prayer.

## III.   APPLICABLE LEGAL STANDARDS

### A.   Defendants Bear the Burden to Defeat the Strong Presumption Against Removal Jurisdiction.

The United States Supreme Court has always recognized that, axiomatically, federal courts are "courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005) (internal quotation omitted). This rule embodies the "[d]ue regard for the rightful independence of state governments, which should actuate federal courts, [by requiring] that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934).

"The gates of federal question jurisdiction are customarily patrolled by a steely-eyed sentry—the 'well-pleaded complaint rule'—which, in general, prohibits the exercise of federal question jurisdiction if no federal claim appears within the four corners of the complaint." *Sheehan v. Broadband Access Servs., Inc.*, 889 F. Supp. 2d 284, 288 (D.R.I. 2012) (granting remand)

6

(quoting *BIW Deceived v. Local S6, Ind. Union of Marine & Shipbuilding Workers of Am..*, 132 F.3d 824, 831 (1st Cir. 1997)). The well-pleaded complaint rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). It is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983) ("*Franchise Tax Bd.*"). For a case to arise under federal law, a plaintiff's well-pleaded complaint must establish either (1) that federal law creates the cause of action, or—"far more rare[ly]"—(2) that a state law cause of action "'necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt.*, 585 F.3d 42, 48 (1st Cir. 2009) (quoting *Grable*, 545 U.S. at 314).

Removal statutes are thus "strictly construed," and "defendants have the burden of showing the federal court's jurisdiction." *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999). "In light of this burden, and of the important federalism concerns at play in considering removal jurisdiction," any doubts as to the propriety of removal are resolved in favor of remand. *Rosselló-González v. Calderón-Serra*, 398 F.3d 1, 11 (1st Cir. 2004).

These principles are particularly true where, as here, a sovereign state brings an action "in state court to enforce its own . . . laws" and "alleges only state law causes of actions brought to protect [state] residents." *Nevada*, 672 F.3d at 676. In this situation, the "claim of sovereign protection from removal arises in its most powerful form." *Id.* (quoting *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011)); *see also Alden v. Maine*, 527

7

U.S. 706, 715 (1999) ("[T]he States retain a 'residuary and inviolable sovereignty.'" (quoting The Federalist No. 39, p. 245)). Stated simply, "considerations of comity make [federal courts] reluctant to snatch cases in which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd.*, 463 U.S. at 21 n.22.

## B. Federal Defenses, Including Ordinary Preemption, Cannot Confer Subject-Matter Jurisdiction.

The well-pleaded complaint rule's close corollary is that "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law, whether anticipated by the plaintiff in the complaint, or asserted by the defendants in the notice of removal. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). It is "settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14; *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 116 (1936) ("By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby."); *Lupez-Munoz v. Triple-S Salud, Inc.*, 754 F.3d 1, 6 (1st Cir. 2014) (even an "obvious" preemption defense does not create removal jurisdiction). State courts are well-equipped to determine whether a state law claim is preempted, and "the fact that a defendant might ultimately prove that a plaintiff's claims are preempted . . . does not establish that they are removable to federal court." *Caterpillar*, 482 U.S. at 398 (punctuation omitted).

8

## IV.   REMAND TO STATE COURT IS REQUIRED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A.   Federal Common Law Does Not Confer Subject-Matter Jurisdiction Over the State's Claims.

Defendants' assertion that the State's tort claims are "governed by" federal common law (Not. of Rem. ¶ 13) could not provide a basis for removal even if it were correct. Defendants' position is, at most, an ordinary preemption defense for the Rhode Island Superior Court to consider on remand. *See, e.g.*, *Franchise Tax Bd.*, 463 U.S. at 14. No appellate authority supports the proposition that state law claims that are "governed by" federal law—whether statutory or common law—for that reason "arise under" federal law within the meaning of 28 U.S.C. § 1331 and are therefore removable. To the contrary, the Supreme Court in *Grable* and its progeny articulated the exclusive test that courts must apply to determine whether a well-pleaded state law claim arises under federal law. *See Grable*, 545 U.S. at 314; *infra* § IV.B. Defendants' theory would obviate the distinction between complete and ordinary preemption, turn the well-pleaded complaint rule on its head, and render any garden variety preemption defense grounds for removal. That result is irreconcilable with *Grable*.

Moreover, Defendants are wrong that the State's claims are "governed by" federal common law at all. The body of common law the Defendants seek to apply was displaced by the Clean Air Act and never resurrected. Additionally, Defendants' assertion that federal common law applies exclusively to any cause of action touching on climate change, such that state law claims under any theory have been obliterated, contradicts the Supreme Court's holding in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*"), and the Ninth Circuit's subsequent decision in *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ("*Kivalina*"), *cert. denied*, 133 S. Ct. 2390 (2013). As the district court correctly found in *San Mateo*, the Supreme Court held "that the question of whether such state law claims survived would

9

depend on whether they are preempted by the federal [Clean Air Act] that had displaced federal common law (a question the Court did not resolve)." *San Mateo*, 294 F. Supp. 3d at 937 (citing *AEP*, 564 U.S. at 429). "Simply put, th[is] cas[e] should not have been removed to federal court on the basis of federal common law that no longer exists." *Id*.

### 1. Defendants' Assertion that Federal Common Law "Governs" the State's Claims Raises an Ordinary Preemption Defense, and Nothing More.

The crux of Defendants' federal common law argument is that this "action is removable because Plaintiff's claims, to the extent that such claims exist, necessarily are governed by federal common law, and not state common law." Not. of Rem. ¶ 13. Defendants conspicuously avoid using the term "preemption," but their argument unavoidably reduces to an ordinary preemption defense, which does not and cannot confer removal jurisdiction on this Court.

It is "settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14; *see also R.I. Fishermen's All., Inc.*, 585 F.3d at 49–50 ("Of course, a federal preemption defense to a state-law cause of action is insufficient to confer federal question jurisdiction on a federal court.") (holding federal question jurisdiction existed under *Grable* because plaintiffs' claims arose from "state statute [that] expressly references federal law"); *supra* § III.B.

Here, Defendants insist *ad nauseum* that the State's claims are "governed by" federal common law. Not. of Rem. ¶ 13. The State strongly disagrees. As explained further below, the district court expressly held in the *San Mateo* cases that they are not. 294 F. Supp. 3d at 937. But even if Defendants were correct that federal common law "governs" any state law cause of action (Not. of Rem. ¶ 18), Defendants would at best have a preemption argument for dismissal of the

10

State's claims *in state court on remand*—not removal. *See, e.g.*, *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 45, 49 (1st Cir. 2008) ("[O]rdinary preemption—*i.e.*, that a state claim conflicts with a federal statute—is merely a *defense* and is not a basis for removal. . . . [N]othing prevents a preemption defense from being asserted, albeit in state courts.").

In the San Francisco and Oakland cases, the district court determined that subject-matter jurisdiction existed and removal was proper because "a uniform standard of decision is necessary to deal with the issues raised in plaintiffs' complaints." *City of Oakland v. BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 1064293, at *3 (N.D. Cal. Feb. 27, 2018) ("*Oakland*"). Respectfully, that decision and order, as the district court found in *San Mateo*, is wrong, and either misapplies or ignores express Supreme Court authority. The court in *Oakland* acknowledged that the city plaintiffs' public nuisance claims were "pled as state-law claims" and facially raised no questions of federal law, but nonetheless found that the well-pleaded complaint rule did not apply. *Id.* at *5.[2] The court neither applied nor even cited *Grable* in *Oakland*; instead the court simply concluded *ipse dixit* that removal was proper because "judicial relief should be uniform across the nation," and the cities' nuisance claims were therefore "governed by" and arose under federal common law, notwithstanding the contents of the well-pleaded complaint. *Oakland*, 2018 WL 106429, at *3, *5. But there is no exception to *Grable* for questions that "should be uniform across the nation," and

---

[2] Citing dicta from *Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*"), the court found that a state law cause of action "'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law." *Oakland*, 2018 WL 1064293, at *5. In *Milwaukee I*, however, the State of Illinois expressly brought "claims founded upon federal common law" in the original jurisdiction of the Supreme Court, and neither alleged state law causes of action nor ever proceeded in state court. 406 U.S. at 100. No question of removal jurisdiction was before the Court or addressed. More than thirty years after *Milwaukee I*, by contrast, the Supreme Court articulated in *Grable* and *Gunn v. Minton*, 568 U.S. 251, 259 (2013), the specific four-part test district courts must apply to determine whether well-pleaded state law claims filed in state court arise under federal law and are removable. *See infra* § IV.B.

11

no court of appeals has held that a district court may ignore *Grable* where a plaintiff could have alleged federal common law claims but elected to rely entirely on state law. In short, even if a state law cause of action is "governed by" federal law—and the State's claims here are not—it does not *per se* "arise under" federal law for removal purposes to the exclusion of a proper *Grable* analysis. For that reason, the court in *Oakland* erred in denying remand.[3]

### 2.   No Appellate Authority Holds That Tort Claims Related to Climate Change Must Be Exclusively Pleaded Under Federal Common Law.

Even if it were a proper basis for removal jurisdiction, Defendants' assertion that any tort claim touching on climate change is necessarily "controlled" by federal common law to the exclusion of all state law is not supported by the cases they cite, nor any other appellate authority.

In *AEP* and *Kivalina*, the Supreme Court and Ninth Circuit, respectively, found that the plaintiffs' claims, both filed in federal district court and expressly pled under federal common law, were displaced by the Clean Air Act. Significantly, neither case considered the relationship between federal common law and state law, and neither case considered any issue of subject matter jurisdiction. In *AEP*, eight states, New York City, and three land trusts sued five electric power companies in federal court, alleging that the companies' greenhouse-gas emissions violated the federal common law of interstate nuisance or, in the alternative, state tort law. 564 U.S. at 418.

---

[3] The court in *City of New York v. BP P.L.C.*, No. 18 CIV. 182 (JFK), 2018 WL 3475470 (S.D.N.Y. July 19, 2018), made the same error in the context of a motion to dismiss, converting the City of New York's well-pleaded state law nuisance and trespass claims into federal common law ones and finding those "federal" claims were displaced by the Clean Air Act. *Id.* at *4. As in *Oakland,* the only cases the court cited for that proposition were ones where the plaintiff expressly pled claims under federal common law. And as in *Oakland,* the court did not perform a *Grable* analysis, but simply declared that the City's causes of actions *were* federal because they supposedly involved "exactly the type of 'transboundary pollution suit[]' to which federal common law should apply." *Id.* As explained in the text, no authority permits a court to do such violence to the plaintiff's well-pleaded complaint, and the court's conclusion misinterprets *AEP*, *Kivalina*, and a host of other cases.

Justice Ginsburg, writing for a unanimous Court, specifically reserved the question of whether state nuisance law may address emissions by stationary sources regulated by the Clean Air Act:

> In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. None of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law. We therefore leave the matter open for consideration on remand.

*Id.* at 429 (citations omitted).[4]

In *Kivalina*, the plaintiff municipality brought both federal and state nuisance claims in federal court against fossil fuel and utility companies. 696 F.3d at 853. The district court had granted the defendants' motion to dismiss the federal claims, separately stating that it "decline[d] to assert supplemental jurisdiction over the remaining state law claims which are dismissed *without prejudice to their presentation in a state court action.*" *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 882–83 (N.D. Cal. 2009) (emphasis added), *aff'd on other grounds*, 696 F.3d 849. Because the plaintiff did not appeal the dismissal of the supplemental state law claims, the Ninth Circuit had no occasion to address federal jurisdiction over them, much less their removability had they been filed originally in state court. Rather, the Court of Appeals applied *AEP*'s holding that the Clean Air Act addresses "domestic greenhouse gas emissions from stationary sources and has therefore displaced *federal* common law." *Kivalina*, 696 F.3d at 856 (emphasis added). As Judge Pro explained:

> Displacement of the federal common law does not leave those injured by air pollution without a remedy. *Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law. . . .*

---

[4] Defendants' reliance on the Court's dictum that "borrowing the law of a particular State would be inappropriate" is also misplaced. *See* Not of Rem. ¶¶ 5, 18. The statement, made without discussion, was not an endorsement of federal common law over state law, but instead an acknowledgement that the case involved eight States and New York City as plaintiffs all suing emitters holding permits in other states. *See AEP*, 564 U.S. at 418, 423. For that reason, selecting the law of one state to control the claims of all plaintiffs and defendants could well have been inappropriate.

The district court below dismissed Kivalina's state law nuisance claim without prejudice to refiling it in state court, and *Kivalina may pursue whatever remedies it may have under state law to the extent their claims are not preempted*.

*Id.* at 866 (Pro, J., concurring) (emphases added).

Defendants conflate the relationship between federal statutes and federal common law, on the one hand, with the relationship between federal law and state law, on the other. *AEP* and *Kivalina* addressed only the relationship between federal common law and federal statutory law; neither case considered the preemptive relationship between federal and state law that invokes a very different calculus. "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *AEP*, 564 U.S. at 423 (citing *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981)).[5] *AEP* and *Kivalina* explicitly left open the viability of state law claims addressing harms related to climate change.

Interpreting *AEP* and *Kivalina* together in the context of removal jurisdiction, the district court in *San Mateo* correctly granted the plaintiffs' motion to remand:

> Far from holding (as the defendants bravely assert) that state law claims relating to global warming are superseded by federal common law, the Supreme Court [in *AEP*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve). [564 U.S. at 429]. This seems to reflect the Court's view that once federal common law is displaced by a

---

[5] *Accord, e.g., Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) *reh'g en banc denied*, 805 F.3d 685 (2015) ("There are fundamental differences between displacement of federal common law by the [Clean Air] Act and preemption of state common law by the Act. For one thing, the Clean Air Act expressly reserves for the states—including state courts—the right to prescribe requirements more stringent than those set under the Clean Air Act."); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 83 (Iowa 2014), *cert. denied*, 135 S. Ct. 712 (2014) ("(1) [T]he question of displacement of federal common law is different than the question of preemption of state law actions, and (2) the standard for displacement of federal common law is different than the standard for preemption of state law. Further, in considering the issues of displacement of federal common law under the [Clean Water Act] and the [Clean Air Act], the Supreme Court has not had to consider the statutory language in the [Clean Air Act] suggesting a congressional intent to not preempt state law.").

federal statute, there is no longer a possibility that state law claims could be superseded by the previously-operative federal common law. . . . Because federal common law does not govern the plaintiffs' claims, it also does not preclude them from asserting the state law claims in these lawsuits.

*San Mateo*, 294 F. Supp. 3d at 937. Likewise here, Defendant's federal common law argument is no more than an ordinary preemption defense and not a valid ground for removal—it does not provide an independent basis for subject matter jurisdiction.

### 3. Defendants' Cases Concerning Whether Federal Common Law "Governs" a Particular Subject Address Ordinary Preemption Defenses and Choice of Law, Not Removal Jurisdiction.

Nor do any of the other cases Defendants cite for their erroneous substantive position that federal law "governs" this case support removal jurisdiction.  Indeed, none even considered that issue.

Rather, all but one of Defendants' cases were filed in federal district court in the first instance, and all considered ordinary preemption or choice of law issues. In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), the Court held generally that in "a few areas, involving 'uniquely federal interests,' . . . state law is pre-empted and replaced" by federal common law. But *Boyle* was a diversity case commenced in district court and did not discuss any jurisdictional issue. *See id.* at 502. The Ninth Circuit in *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156 (9th Cir. 2016), likewise did not consider any jurisdictional question. The court held only that breach of contract claims against military contractors are "governed by federal common law" for *choice of law* purposes and affirmed dismissal for failure to state a claim. *Id.* at 1159–61. In *International Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987), the action was removed from Vermont state court on diversity grounds and considered only whether the Clean Water Act preempted the common law causes of action as alleged—not whether any basis for jurisdiction existed beside diversity. *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 310

15

(1981) ("*Milwaukee II*"), began when the State of Illinois filed a complaint in federal court seeking to abate an alleged nuisance "under federal common law." The Court considered whether the Clean Water Act displaced certain federal common law nuisance claims related to water pollution but did not present any jurisdiction or removability issue. *Id.* Finally, the court in *Resolution Trust Corp. v. Gladstone*, 895 F. Supp. 356, 362 (D. Mass. 1995), considered whether negligence and breach of fiduciary duty claims brought against federally chartered banks had to be resolved under federal common law, to the exclusion of state common law. The court found that under the "internal affairs doctrine," the interest in uniformity favored applying the law of the chartering jurisdiction—in that case the federal government—to claims against the chartered bank, and therefore granted summary judgment to the defendant banks "to the extent [certain counts in the complaint] allege claims based on state law." *Id.* at 363–65.[6] In short, Defendants' cases have nothing to do with the removability of state law claims.[7]

### 4. The State's Claims Fall Outside the Scope of Any Operative Federal Common Law in Any Event.

Even if the federal common law Defendants champion had not been displaced (it has), and

---

[6] *National Farmers Union Insurance Companies v. Crow Tribe of Indians*, 471 U.S. 845 (1985), which Defendants cite (Not. of Rem. ¶¶ 5, 13), does not alter the calculus. The plaintiffs there sued the Crow Tribe in federal district court, seeking to enjoin enforcement of a default judgment entered by the tribal court. *Id.* at 847–48. The Court held that jurisdiction existed over the plaintiff's claims under 28 U.S.C. § 1331 because the plaintiffs themselves "contend[ed] that federal law has divested the Tribe" of the "power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court," and thus facially presented a federal question. *Id.* at 852–53. *Crow Tribe*, like *Kivalina* and *AEP*, was filed in federal court on explicitly federal law theories, and involved neither removal jurisdiction, nor the relationship between state laws and federal common law, nor the complete preemption doctrine.

[7] Defendants also raise a puzzling argument, citing no authority, that removal is proper because "the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny." Not. of Rem. ¶ 17. That argument simply repackages the ordinary preemption defense asserted elsewhere in the Notice. To say a "particular claim is controlled by federal common law rather than state law" is simply to say that federal common law preempts state law. "Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court." *Metro. Life Ins. Co.*, 481 U.S. at 63; *supra* § III.B.

16

federal common law "controlled" in all cases against greenhouse gas emitters (it does not), Defendants' argument would still fail. There is no federal common law applicable to claims against manufacturers and sellers for tortious promotion and marketing of products known to be dangerous. Nor does any "uniquely federal interest" warrant application of federal common law.

The State's claims focus on Defendants' wrongful production, promotion, and marketing of their fossil fuel products. *See, e.g.*, Compl. ¶¶ 225–315. The State does not seek injunctive relief that would compel any regulatory agency to reconsider its regulations, nor does it seek to interfere with permits held by any party under the Clean Air Act or any other law. Rather, the State seeks damages and abatement—the costs for adaptation and mitigation measures within its geographic boundaries—against the manufacturers and promoters of products they knew would cause harm.

Nothing supports applying federal common law to Plaintiffs' claims. The instances where it is appropriate to develop federal common law are "few and restricted." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citations omitted). There must be a "uniquely federal interest," *id.*, and a "significant conflict" between federal policy or interests and state law, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

Climate change is far from a "uniquely federal interest." Indeed, the havoc wreaked at the state and local level directly implicates fundamental state interests, and many state laws address climate change and global warming, including those of Rhode Island. *See, e.g.*, Resilient Rhode Island Act, 2014 R.I. Pub. Laws 42-6.2 (sets specific greenhouse gas reduction targets and incorporates consideration of climate change impacts into the powers and duties of all state agencies); Air Pollution Control Regulation No. 46, R.I. Admin. Code 25-4-46 (July 22, 2008) (setting $CO_2$ Budget Trading Program for Regional Greenhouse Gas Initiative); *accord, e.g.,* California Global Warming Solutions Act of 2006, Cal. Health & Safety Code § 38501 *et seq.*;

Oregon Clean Fuels Program, Or. Admin. R. 340–253–0000.[8]

Courts have frequently and expressly recognized states' interests in combatting climate change. In *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), the Ninth Circuit rejected challenges to California's regulation of certain fuels even though the regulations might affect out-of-state producers:

> Because [greenhouse gases] mix in the atmosphere, all emissions related to transportation fuels used in California pose the same local risk to California citizens. That these climate change risks are widely-shared does not minimize California's interest in reducing them. . . . One ton of carbon dioxide emitted when fuel is produced in Iowa or Brazil harms Californians as much as one emitted when fuel is consumed in Sacramento.

*Id*. at 1080–81 (citation and quotation omitted). As the court noted, "[i]f [greenhouse gas] emissions continue to increase, California may see its coastline crumble under rising seas, its labor force imperiled by rising temperatures, and its farms devastated by severe droughts." *Id.* at 1097. *Accord, e.g.*, *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 339–40 (D. Vt. 2007) (rejecting preemption of regulations addressing greenhouse gas emissions standards for new automobiles; emphasizing that the states' "regulation of greenhouse gases emitted from motor vehicles has a place in the broader struggle to address global warming").[9]

Second, it is well established that suits against sellers and manufacturers of products do not

---

[8] Rhode Island has joined eight Northeastern and Mid-Atlantic states in the development of the Regional Greenhouse Gas Initiative (RGGI), a market-based cap and trade program designed to reduce greenhouse gas emissions. In a letter to Congress, the signatory states declared, "Our states acknowledge the need to take aggressive actions to reduce greenhouse gas emissions in order to mitigate the serious impacts that unchecked climate change will have on the environment and economies of our states." Letter from RGGI to Congress (Oct. 31, 2007), https://www.rggi.org/sites/default/files/Uploads/EPA-Comments/2007_10_31_RGGI_Letter.pdf.

[9] *Accord Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 134 F. Supp. 3d 1270, 1285 (D. Or. 2015) (Oregon regulations of lifecycle greenhouse gas emissions from transportation fuels are not preempted, in part because "air pollution prevention is within the states' traditional authority—for which 'there is a general presumption against preemption' absent a 'clear and manifest' expression of intent by Congress") (citation omitted), *appeal filed*, No 15-35834 (9th Cir. Oct. 27, 2015).

18

present "uniquely federal interests" warranting application of federal common law, even where nationwide conduct or impacts are at stake. *See, e.g.*, *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1324 (5th Cir. 1985) (*en banc*) (state law, not federal common law, governed in cases against asbestos manufacturers); *In re Agent Orange Prod. Liab. Litig.*, 635 F.2d 987, 995 (2d Cir. 1980) (state law, not federal common law, governed class action tort case on behalf of millions of U.S. soldiers who had served in Vietnam against producers of Agent Orange, despite federal interest in the health of veterans). The fact that a product is sold in many states, or causes injury throughout the country, does not create a "uniquely federal interest." As the Fifth Circuit explained in *Jackson*: "A dispute . . . cannot become 'interstate,' in the sense of requiring the application of federal common law, merely because the conflict is not confined within the boundaries of a single state." 750 F.2d 1324; *accord In re Agent Orange Prod. Liab. Litig.*, 635 F.2d at 994 ("[T]here is no federal interest in uniformity for its own sake. . . . The fact that application of state law may produce a variety of results is of no moment" and is "the nature of a federal system.").

Third, there is no "uniquely federal interest" merely because the injury results from emissions of a pollutant regulated by the Clean Air Act. *See Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1203 (9th Cir. 1988) ("[T]here is not 'a uniquely federal interest' in protecting the quality of the nation's air. Rather, the primary responsibility for maintaining the air quality rests on the states."); *Merrick*, 805 F.3d at 687 ("The Clean Air Act states that air pollution prevention and control is the primary responsibility of individual states and local governments." (*citing* 42 U.S.C. § 7416)). Courts have allowed state law claims against manufacturers even where their products were regulated under the Clean Air Act. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (rejecting preemption of state tort claims against producers of gasoline for contamination of city's groundwater wells with MTBE, a

19

gasoline additive regulated under the Clean Air Act)*; In re Volkswagen "Clean Diesel" Litig.*, 2016 WL 10880209 *5–6 (Va. Cir. Ct. 2016) ("*Volkswagen*") (permitting state law claims against defendant vehicle manufacturer based on tortious behavior beyond alleged noncompliance with Clean Air Act emissions standards); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 591–92 (E.D. Mich. 2017) (claims against vehicle manufacturer not preempted where "the gravamen of Plaintiffs' claims, like in *Volkswagen*, focus on 'the deceit about compliance, rather than the need to enforce compliance.'").

**B.      The State's Complaint Does Not Necessarily Raise Any Substantial, Disputed Federal Questions and Therefore Does Not "Arise Under" Federal Law.**

Defendants' second argument, invoking *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), dramatically overreads the scope of jurisdiction federal courts may assert over state law claims, and misconstrues the relief the State seeks. Only two types of actions invoke federal question jurisdiction: (1) those asserting causes of action created by federal law and, much less commonly, (2) those asserting state law causes of action that "arise under" federal law. *Grable*, 545 U.S. at 312. The State's claims do not fall into the first category because, on their face, they are not federal causes of action. They also do not come within the second category, because the causes of action arise under Rhode Island law. *Grable* and its progeny instruct that a well-pleaded state law cause of action "arises under" federal law for removal purposes only when the plaintiff's affirmative case "will necessarily require application" of federal law, such that it cannot meet its *prima facie* burden without reliance on a federal standard. *Gunn*, 568 U.S. at 259. *Grable* and its progeny did not alter the bedrock rule that federal *defenses* cannot create removal jurisdiction (*see supra* § III.B), no matter how important those defenses may ultimately prove to the litigation.

20

Here, just as in *San Mateo*, "the defendants have not pointed to a specific issue of federal law that must necessarily be resolved to adjudicate the state law claims. Instead, the defendants mostly gesture to federal law and federal concerns in a generalized way." *San Mateo*, 294 F. Supp. 3d at 938. Defendants do not and cannot argue that the State's *prima facie* case "requir[es] resolution of a substantial question of federal law, or even interpreting federal law." *Franchise Tax Bd.*, 463 U.S. at 13. Defendants instead contend that the Complaint's wholly state law claims are *unavailable* based on a flotilla of purported federal defenses ranging from the actions of federal regulators to the First Amendment. The standard Defendants advocate would mutate the clear, four-part *Grable* test into a free-floating inquiry into how much interpretation of federal law the trial court may encounter in the course of the litigation—whether or not those issues appear on the face of the complaint. Defendants fail to show that the Complaint necessarily invokes disputed and substantial questions of federal law, and therefore removal under *Grable* is improper.

### 1.    The State's Complaint Does Not "Necessarily Raise" Any "Actually Disputed" Issues of Federal Law.

The Supreme Court has repeatedly and unambiguously held that state law causes of action only fall into the "'special and small' category of cases in which arising under jurisdiction still lies," *Gunn v. Minton*, 568 U.S. 251, 258 (2013), if they "really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313 (quoting *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912)); *Gunn*, 568 U.S. at 258 (same) (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). Federal jurisdiction exists over a wholly state-law complaint only in the limited circumstance where a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. None of those factors is met here.

21

The State's Complaint does not "necessarily raise" any "disputed" issue of federal law, substantial or otherwise. A complaint satisfies this element only where a "question of federal law is a *necessary element* of one of the well-pleaded state claims." *Franchise Tax Bd.*, 463 U.S. at 13 (emphasis added). Where a court need not reach a federal argument, because the case "may well be decided on other grounds," a federal question is not "necessarily raised." *Wendella Sightseeing Co. v. Blount Boats, Inc.*, C.A. No. 17-388 (WES), 2018 WL 1620925 (D.R.I. Mar. 30, 2018).

The rights and duties the State seeks to vindicate, and its entitlement to relief, all stem entirely from Rhode Island law and do not incorporate or depend on any federal standards.[10] None of the State's claims depends on federal law to create the right to relief, none incorporates a federal tort duty that Defendants allegedly violated, and none turns on the application or interpretation of federal law in any way. In short, there is no necessary, disputed federal law issue.

Courts routinely remand where, as here, the case takes place against a factual backdrop of federal regulation but no claim relies on a federal right to relief or turns on interpreting federal law. *See, e.g.*, *Oregon ex rel. Kroger v. Johnson & Johnson*, 832 F. Supp. 2d 1250, 1255–56, 1260

---

[10] The State's first cause of action relies on Defendants' creation of and contribution to a public nuisance, as defined under Rhode Island law. Compl. ¶¶ 225–37; *Citizens for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59 (R.I. 1980) (elements of public nuisance claim). The second and third causes of action rely on Defendants' manufacturing, marketing, and selling defective products, and failing to warn of known defects, all as defined under Rhode Island law and in violation of duties imposed by Rhode Island law. Compl. ¶¶ 238–63; *Raimbeault v. Takeuchi Mfg. (U.S.) Ltd.*, 772 A.2d 1056, 1063–64 (R.I. 2001) (defining strict product liability for design defect and failure to warn). The fourth and fifth causes of action allege that Defendants negligently designed, manufactured, marketed, and sold defective and dangerous products, and negligently failed to warn of known defects, all in violation of duties imposed by Rhode Island law. Compl. ¶¶ 264–84; *Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446, 451 (R.I. 2013) (elements of negligent products liability). The sixth cause of action alleges Defendants' conduct caused an unlawful, unconsented intrusion onto the State's real property, violating Rhode Island law duties. Compl. ¶¶ 285–93; *Bennett v. Napolitano*, 746 A.2d 138, 141 (R.I. 2000) (defining trespass). The seventh cause of action is a common law claim of an impairment of public trust resources in violation of the Rhode Island Constitution, Article I, Section 17. Compl. ¶¶ 294–305. And the eighth cause of action alleges a violation of the State Environmental Rights Act. R.I. Gen. Laws § 10-20-1. *Id.* ¶¶ 306–15.

22

(D. Or. 2011) (remanding state's claims against drug manufacturers where state could prove its claims arising out of manufacturers' "secret recall" of defective drugs without calling into question validity of FDA's decision not to order public recall). Here, the State's causes of action do not depend on any violation of federal law to create a right to relief: though *factual* issues may arise touching on Defendants' interactions with the federal government, the Complaint neither alleges nor depends on any violation of federal *law*. *See also San Mateo*, 294 F. Supp. 3d at 938 ("Nor does the mere existence of a federal regulatory regime mean that these cases fall under *Grable*.").[11]

Defendants do not argue that the State's claims *do* depend on the interpretation of federal law but insist instead that some elements of some causes of action *resemble* federal regulatory considerations. Not. of Rem. ¶¶ 25–26. Defendants are mistaken. They surmise that the State's nuisance claims will require "the same analysis of benefits and impacts" from fossil fuels that federal agencies conduct under several statutes. *Id.* ¶ 26. But, of course, an agency's prospective, generalized, policy-oriented "balancing" pursuant to regulatory authority is different in kind from the backward-looking, case-specific factor weighing a court may conduct in a common law tort

---

[11] Many cases stand for the same proposition, across circuits and regulatory contexts. *See, e.g.*, *Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 770 F.3d 944, 947–48 (10th Cir. 2014) (no federal question jurisdiction over a breach of contract claim against Indian Tribe even though contract required approval from U.S. Secretary of the Interior); *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1032 (9th Cir. 2011) ( "[t]he mere fact that the Secretary of the Interior must approve oil and gas leases does not raise a federal question"); *Shanks v. Dressel*, 540 F.3d 1082, 1093 (9th Cir. 2008) (no federal question jurisdiction where claim respecting building permit at federally registered historic place turned on compliance with municipal code only and not compliance with federal regulations governing historic places); *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 912 (7th Cir. 2007) (reversing denial of remand in personal injury case stemming from airline crash: despite extensive federal regulation of air travel, the fact "that some standards of care used in tort litigation come from federal law does not make the tort claim one 'arising under' federal law"); *Kirk v. Palmer*, Np. Civ. A 97-2587, 19 F. Supp. 3d 707, 708–12 (S.D. Tex. 2014) (no federal jurisdiction over state law breach of contract claim arising from federal patent, because state contract law and fiduciary principles controlled right of recovery); *In re Vioxx Prods. Liab. Litig.*, 843 F. Supp. 2d 654, 669 (E.D. La. 2012) (granting remand of State's state law consumer protection claim where, to the extent it concerned a violation of FDA reporting requirements "that federal question would be resolved in the context of whether that conduct constituted a violation of *Kentucky* law").

suit. The critical distinction was highlighted by the Iowa Supreme Court in *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014). Holding that the Clean Air Act did not preempt residents' state law claims over pollution from a corn milling facility, the court emphasized that unlike the civil penalties imposed under the Act to protect the public at large, "the common law focuses on special harms to property owners caused by pollution at a specific location" allowing owners of real property to "obtain compensatory damages, punitive damages, and injunctive relief. . . in particular locations for actual harms." *Id.* at 69. So too here. Rhode Island's common law claims have no relationship or overlap with the various regulatory laws and agency decisions Defendants gesture toward. Even if Defendants' position were correct, moreover, it would at most present a conflict preemption defense, which is outside *Grable*'s scope and does not make any federal law issue "actually disputed." As the district court correctly held in *San Mateo*, "[o]n the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable. *Grable* does not sweep so broadly." *San Mateo*, 294 F. Supp. 3d at 938.

The cases Defendants cite in this regard point to the fatal flaw in their argument. In every case cited, the plaintiff's claims did not merely touch on a defendant's federally regulated conduct; rather, the right to relief itself grew directly out of federal regulation. In *Board of Commissioners of Southeast Louisiana Flood Protection Authority v. Tennessee Gas Pipeline Co.*, 850 F.3d 714, 720–21 (5th Cir. 2017) *Tennessee Gas Pipeline*"), *cert. denied*, 138 S. Ct. 420 (Oct. 30, 2017), for example, the plaintiff alleged that various defendant companies had increased regional flood risk by dredging a network of canals to facilitate fuel transport from oil and gas wells. Even though the plaintiff's claims were framed under state law, the court found removal proper because the complaint itself "dr[ew] on federal law as the *exclusive basis* for holding Defendants liable for

24

some of their actions," which were not subject, under Louisiana law, to the duties the plaintiffs sought to enforce—namely backfilling the canals and performing other regional flood mitigation. *Id.* at 722–23 (emphasis added). Therefore, "[t]he absence of any state law grounding for the duty . . . for the Defendants to be liable means that that duty would have to be drawn from federal law." *Id.* at 723. Removal was therefore proper because the nuisance and negligence claims "[could not] be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law." *Id.* Here, by contrast, the relief the State seeks, and the duties it seeks to enforce, are drawn from traditional precepts of Rhode Island law.[12]

Defendants cite *Anversa v. Partners Healthcare Systems, Inc.*, 835 F.3d 167, 175 (1st Cir. 2016), in passing for the proposition that federal jurisdiction is proper where a plaintiff's claims "turn on the interpretation of federal regulations." *See* Not. of Rem. ¶ 28. *Anversa* bears no resemblance to this case, because the state tort law claims asserted there all "turned on" the interpretation of federal regulations incorporated into the plaintiffs' employment contracts. 835 F.3d at 173, 174 n.5. In contrast to the specific federal regulations explicitly at issue in *Anversa*,

---

[12] All of Defendants' other citations present the same issue: a nominally state law cause of action that depended entirely on federal law to create the right to relief. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001) (finding that "fraud on the FDA" claims "exist[ed] solely by virtue of the [federal] disclosure requirements," unlike "certain state-law causes of actions that parallel federal safety requirements" but do not depend on a substantial federal question); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming removal of state securities violation claim challenging federally approved "Stock Borrow Program," where plaintiff alleged program "by its mere existence, hinders competition," and therefore "directly implicate[d] actions taken by the [SEC] in approving the creation of the Stock Borrow Program and the rules governing it"); *Bader Farms, Inc. v. Monsanto Co.*, No. 1:16-CV-299 SNLJ, 2017 WL 633815, at *2–3 (E.D. Mo. Feb. 16, 2017) (fraudulent concealment claims rested on defendant's alleged withholding of material information from the Department of Agriculture, and therefore necessarily raised a federal question because the information defendants were required to disclose was defined by federal regulations that "in large part, . . . identif[y] the duty to provide information and the materiality of that information"); *W. Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 233 (E.D.N.Y. 2007) (removal jurisdiction existed over case challenging Medicaid reimbursement rates because "[r]esolution of the question of the state's obligation to reimburse its insureds for Zyprexa, using funds largely provided by the federal government, is essential to the state's theory of damages and presents a substantial and disputed federal issue under *Grable*").

Defendants identify no specific federal regulation this case "turns on," aside from a generalized cost-benefit analysis the federal government engages in any time it exercises regulatory authority. Under Defendants' logic, *any* state law nuisance or products liability case against a company subject to federal regulation would be subject to removal—an indefensible result that would turn the "narrow swath of cases described in *Grable*" on its head. *Id.* at 174 n.5.

### 2. Defendants Have Not Shown That the Complaint Raises Questions of Federal Law That Are "Substantial" to the Federal System as a Whole.

Even if a question of federal law were necessarily raised and actually disputed, Defendants have not met their burden to prove such a question is "substantial" within *Grable*'s meaning. A federal issue is "substantial" if (1) it presents "a nearly pure issue of law" that "could turn on a new interpretation of a federal statute or regulation which will govern a large number of cases" or (2) "where a claim between two private parties, though based in state law, directly challenges the propriety of an action taken by a federal department, agency, or service." *Municipality of Mayagüez v. Corporación Para el Desarrollo del Oeste, Inc.*, 726 F.3d 8, 14 (1st Cir. 2013) (citing *Empire Healthchoice Assur.*, 547 U.S. at 700–01). "[F]act-bound and situation-specific" questions "are not sufficient to establish arising under jurisdiction." *Gunn*, 568 U.S. at 263.

Defendants do not bother to address any of the substantiality factors the Supreme Court has provided. Instead they present a jumble of federal standards that might become relevant (*see generally* Not. of Rem. ¶¶ 22–33), but do not identify any determinative "pure issue of law." *See Mayagüez*, 726 F.3d at 14. The only causes of action Defendants specifically mention—nuisance and products liability—by Defendants' own reasoning, require detailed, fact-bound "risk-utility balancing." Not. of Rem. ¶¶ 25, 47. Defendants also do not point to any aspect of this case that will control many other cases raising the same purported federal issues. The most Defendants assert—wrongly—is that the nuisance and product liability claims will require "the same analysis

26

of benefits and impacts" that some federal agencies conduct pursuant to federal regulations. Not. of Rem. ¶¶ 27, 47. But the State does not ask that those federal regulatory decisions be amended or supplanted in any regard. And Defendants do not explain how the jury's determinations on those questions would control any federal law issue in future cases. They do not. Ultimately, Defendants have not met their burden to show that any federal issue that may arise in this case is "substantial" under *Grable*.

### 3.    Congress Has Struck the Balance of Judicial Responsibility in Favor of State Courts Hearing State Law Claims.

Even if the other *Grable* factors were satisfied, removal would still be improper because Congress has struck the jurisdictional balance in favor of the State's claims being heard in state court. The Supreme Court has provided clear guidance for the limited circumstances in which state law claims may be removed: "[T]he combination of no federal cause of action and no preemption of state remedies" is "an important clue to Congress's conception of the scope of jurisdiction to be exercised under § 1331," and indicates that federal jurisdiction is not specially favored. *Grable*, 545 U.S. 318. To find jurisdiction where there is no private federal cause of action "flout[s], or at least undermine[s], congressional intent." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 812 (1986).

Defendants ignore this factor. The Clean Air Act *affirmatively declares* the "primary" role of the states in protecting air quality (42 U.S.C. § 7401(a)(3)), and twice expressly *preserves* rights of action existing under state law. *See infra* § IV.C.2; 42 U.S.C. §§ 7416, 7604(e). The Clean Air Act also does not provide a private right of action akin to the State's claims that provides the remedies the State seeks, providing additional proof that Congress did not intend the district courts

27

to serve as the primary—much less exclusive—forum to resolve such claims.[13]

Under *Grable*'s plain terms, the "congressionally approved balance of federal and state judicial responsibilities" here favors state court jurisdiction. *Grable*, 545 U.S. 314. Indeed, redressing the kinds of deceptive marketing and promotion campaigns Defendants undertook here falls directly within the traditional police power of the states. *See* **Error! Bookmark not defined.***In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 133–34 (2d Cir. 2007) (allowing government entity to seek monetary relief against refiners to remedy and prevent environmental damage); *accord, e.g.*, *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960 (W.D.N.Y. 1989) (entering summary judgment on public nuisance claim and finding that assumption of risk doctrine did not bar liability where governmental entity asserted claim in exercise of its police power to protect human health).

### 4.    Defendants' Laundry List of Federal Defenses Does Not Provide Federal Jurisdiction.

Defendants present a non-exclusive list of seven federal issues they assert will crop up in the litigation, but none provides a basis for removal jurisdiction because they are all *defenses*. Defendants preview defenses based on the First Amendment; federal Due Process; the Clean Air

---

[13] Defendants point to a number of other statutes for the proposition that energy regulation is a national concern, but none of them shows Congress intended a federal forum for every injury related in any way to energy production. The Surface Mining Control and Reclamation Act's savings clauses preserve both "any State law or regulation . . . which provides for more stringent land use and environmental controls and regulations of surface coal mining and reclamation operation than do the provisions of this chapter," and "any right which any person (or class of persons) may have under any statute or common law." 30 U.S.C. §§ 1255, 1270(e). It does create a private right of action for any person "injured in his person or property through violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter," but no such injury is alleged here. *Id.* § 1270(f). The Energy Reorganization Act established the Energy Research and Development Administration and Nuclear Regulatory Commission, and the only substantive rights it addresses are whistleblower protection for nuclear safety employees. *See generally* 42 U.S.C. §§ 5801 *et seq.*; *id.* §§ 5851–53 (whistleblower protection). Finally, the Mining and Minerals Policy Act provides certain rights related to procuring and challenging land patents and mining claims that have nothing to do with tort claims arising from pollution. *See* 30 U.S.C. §§ 21a, 29–32, 54.

Act's displacement of federal common law; the Commerce Clause; the foreign affairs doctrine; "whether a state court may review and assess the validity of acts of foreign states"; and some undisclosed federal laws "relating to the ownership and control of land" at locations such as coasts and interstate highways. *See* Not. of Rem. ¶ 31. Couching these"federal issues" as "notable" does not bring them within *Grable*'s limited scope, and Defendants' admission that they are not "strictly jurisdictional" surrenders the argument: none is "a necessary element of one of the well-pleaded state claims," because they are all, instead, defenses. *See Franchise Tax Bd.*, 463 U.S. at 13. The hodgepodge of issues in Paragraph 31 of the Notice does not appear on the face of the Complaint and cannot impart "arising under" jurisdiction. *See, e.g.*, *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 478–79 (6th Cir. 2008) ("specter of [federal] equal protection problem" raised by challenge to Ohio Secretary of State's ballot-counting procedure did not create removal jurisdiction because it was "at best a federal defense that the Secretary may or may not wish to inject into the case in the Ohio courts" on remand).

**5.  Defendants' Invocation of Foreign Relations Is a Red Herring and Not a Basis for Federal Jurisdiction.**

Lastly, Defendants argue that the State's claims are federal in character because they may "intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine." Not. of Rem. ¶ 32. "The mere potential for foreign policy implications (resulting from plaintiff[] succeeding on [its] claims at an unknown future date) does not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction." *San Mateo*, 294 F. Supp. 3d at 938. Accordingly, Defendants' argument fails for at least two reasons: First, the foreign affairs doctrine, like the myriad other federal issues Defendants raise, is merely an ordinary preemption defense outside *Grable*'s scope. *See supra* § III.B. "Under the foreign affairs doctrine, state laws that intrude on th[e] exclusively federal power [to administer

29

foreign affairs] are preempted, under either the doctrine of conflict preemption or the doctrine of field preemption." *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016). "Just as raising the specter of political issues cannot sustain dismissal under the political question doctrine, neither does a general invocation of international law or foreign relations mean that an act of state is an essential element of a claim." *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1091 (9th Cir. 2009) (reversing denial of motion to remand).

Second, assuming *arguendo* that foreign affairs preemption might be a basis for "arising under" jurisdiction, Defendants' foreign affairs argument is specious, not least because it wildly overstates the scope of relief the State seeks. To intrude on the federal government's foreign affairs power, an action must "produce something more than incidental effect in conflict with express foreign policy of the National Government." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 421 (D. Me. 2017). The Complaint does not come close to meeting that standard.[14]

Defendants' statement that the Complaint "see[ks] to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties" (Not. of Rem. ¶ 32) is patently false. The State does not seek injunctive relief against any party, foreign or domestic; does not seek to modify any greenhouse gas regulation, law, or treaty, foreign or domestic; and surely does not "see[k] to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States." *Id.* ¶ 33. The Attorney General, acting on behalf of the State, is vested with authority to maintain suits seeking redress of

---

[14] The other cases Defendants cite (Not. of Rem. ¶¶ 32, 33) are factually miles apart from this one and all involved states' attempts to directly regulate aliens or conduct of foreign sovereigns. *See Hines v. Davidowitz*, 312 U.S. 52, 65–68 (1941) (states may not place registration requirements on immigrants that conflict with federal immigration standards); *United States v. Pink*, 315 U.S. 203, 231–32 (1942) (New York could not "refus[e] to give effect to or recogni[ze]" nationalization of private property by Soviet Government "in the face of a disavowal by the United States of any official concern with that program").

a public wrong. The suit seeks only damages and abatement of the nuisance within Rhode Island. Compl. ¶ 12. The State does not seek to regulate conduct across the globe.

Last, Defendants cannot manufacture federal jurisdiction merely by invoking a doctrine that cannot conceivably apply here. Foreign affairs field preemption only applies where a state "take[s] a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 n.11 (2003). That is, the State must purport to make its own foreign policy through legislation or otherwise. Here, the only State action is the pleading of generally-applicable tort claims, an area of traditional state responsibility for harms to the State. Likewise, conflict preemption requires a "clear conflict" between state and federal law, *id.* at 420, which Defendants have not even purported to identify. Therefore, even if the foreign affairs defense could create a basis for removal jurisdiction—and it does not—no necessary element in any of the State's claims substantially impinges on the federal government's foreign policy prerogative.

### 6. Federal Laws Authorizing Regulation of Navigable Waters Do Not Confer *Grable* Jurisdiction.

Marathon's Supplemental Notice of Removal—arguing that the State's claims are a "collateral attack on the federal regulatory scheme for navigable waters," Supp. Not. of Rem. ¶ 4— suffers from the same fatal flaws as Defendants' previous argument for *Grable* jurisdiction. Marathon does not identify any specific federal statute or regulation that is necessarily raised as an element of the State's claims, but merely alludes to federal law in a generalized way. Like the previous litany of possible federal issues, Marathon's invocation of navigable waters is, at most, a preemption defense incapable of generating federal jurisdiction. The mere possibility that some mitigation infrastructure may require a federal permit (again, "resulting from plaintiff[] succeeding on [its] claims at an unknown future date," *San Mateo*, 294 F. Supp. 3d at 939), is not an issue

"necessarily raised" by the Complaint. Marathon's reliance on *Tennessee Gas Pipeline*, 850 F.3d at 714, is again misplaced. In that case, the plaintiffs sought to require the defendants to backfill an extensive network of canals, explicitly relying on federal duties under the Rivers and Harbors Act. *Id.* at 721. The court found federal jurisdiction proper in that case not because a federal permit would eventually be required to authorize the relief requested, but instead because federal law supplied the duty at issue. *Id.* at 721, 723. Here, in contrast, state law supplies the duties at issue, and therefore there is no need to resort to federal law.

Notably, Marathon fails to cite a single case authorizing removal under the Rivers and Harbors Act; as far as the State is aware, the only case law on point precludes such removal. *See Kieff v. La. Land & Expl. Co.*, 1997 WL 627563 (E.D. La. Oct. 9, 1997). And Marathon's reliance on *Oakland* (Supp. Not. of Rem. ¶ 8) is illusory. The court's statements about navigable waters were unmoored from any *Grable* analysis, nor did the decision even cite *Grable*. *See Oakland*, 2018 WL 1064293, at *5.

Nor are any of the purported federal issues involving oversight of navigable waters "actually disputed" or "substantial." Any such disputes would be heavily "fact-bound and situation specific," and thus are the opposite of the nearly "pure issue[s] of law" that on very rare occasions suffice to create *Grable* jurisdiction. *See Empire Healthchoice Assur.*, 547 U.S. at 700–01.

## C. The Clean Air Act Does Not Completely Preempt the State's Claims.

Defendants fail to meet the high bar required to show the Clean Air Act completely preempts the State's claims to the extent they are related to emissions (Not. of Rem. ¶¶ 34–46), let alone complete preemption of the tortious marketing and promotional conduct here at issue.[15]

---

[15] Nor is the foreign affairs doctrine grounds for complete preemption. Defendants cite no authority for the proposition that the judicially created foreign affairs doctrine is a basis for complete preemption, which

The Supreme Court recognizes a narrow "corollary" to the well-pleaded complaint rule where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co.*, 481 U.S. at 65). Complete preemption arises only in rare situations where "Congress intends not merely to preempt a certain amount of state law, but also intends to transfer jurisdiction of the subject matter from state to federal court." *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183–84 (9th Cir. 2002); *see also Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 925 (5th Cir. 1997) (citing *Metro. Life Ins. Co.*, 481 U.S. at 65–66). Thus, a federal statute completely preempts only where (1) it provides "the exclusive cause of action for the claim asserted," and (2) it "set[s] forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank*, 539 U.S. at 8. The Clean Air Act provides neither an exclusive cause of action for the State's claims, nor procedures or remedies governing such a cause of action.

The Supreme Court has expressed great "reluctan[ce] to find th[e] extraordinary pre-emptive power" required for complete preemption, *Metro. Life Ins. Co.*, 481 U.S. at 65, encountering only three such statutes in the past half century.[16] It is unsurprising, then, that

---

requires clear congressional intent. Neither of Defendants' cases on the foreign affairs doctrine arose in the context of a motion to remand or even complete preemption. *See* Not. of Rem. ¶ 36 (citing *Garamendi*, 539 U.S. at 418,  City of *Oakland v. BP P.L.C.*,, No. C 17-06011 WHA, 2018 WL 3109726, and *California v. Gen. Motors Corp.*, No. C06-05755 MJJ, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007)). Both *Garamendi* and *Gen. Motors Corp.* were filed originally in federal court and both addressed generalized issues of the lawsuit's effect on foreign affairs—with no mention of the specific Congressional intent required for complete preemption. *Oakland* raised the foreign affairs doctrine on a motion to dismiss, not removal, and did not consider complete preemption at all. For the reasons discussed *supra*, § IV.B, the foreign affairs doctrine does not support removal under *Grable* and it is equally inapposite here.

[16] *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9–11 (2003) (National Bank Act); *Metro. Life Ins. Co.*, 481 U.S. at 65–66 (Section 502(a) of the Employee Retirement Income Security Act of 1974); *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968) (Section 301 of the Labor Management Relations Act).

Defendants are unable to cite a single case holding that the Clean Air Act completely preempts any state law tort claims related to airborne emissions, not to mention the tortious marketing and promotion at issue in this case. To the contrary, there are many cases rejecting any notion that the Clean Air Act completely preempts similar claims and remanding to state court.[17] In fact, courts often reject even ordinary preemption defenses asserted under the Clean Air Act and allow state law claims arising from air pollutants to proceed.[18] Defendants' attempt to reach a different outcome here mischaracterizes both the nature of the Clean Air Act and relief sought by the State.

> **1.      Far from Indicating Congressional Intent to Completely Preempt State Law, the Clean Air Act Repeatedly Emphasizes the Primary Role of the States.**

The Clean Air Act has nothing to do with the claims brought and relief sought by the State. Considering identical arguments by Defendants, the district court in *San Mateo* held that nothing

---

[17] *See, e.g.*, *Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 342–43 (6th Cir. 1989) (denying removal based on complete preemption because "the plain language of the [Clean Air Act's] savings clause . . . clearly indicates that Congress did not wish to abolish state control"); *Morrison v. Drummond Co.*, No. 2:14-cv-0406-SLB, 2015 WL 1345721, at *3–*4 (remanding because "this [state law tort] case does not support a finding that the Clean Air Act has completely preempted plaintiff's state common law causes of action"); *Cerny v. Marathon Oil Corp., No. CIV.A. SA-13-CA-562,* 2013 WL 5560483, at *8 ("Plaintiffs' claims are not completely preempted and . . . federal question jurisdiction is lacking."); *California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. Hardesty Sand & Gravel*, No. 2:11-CV-02278 JAM, 2012 WL 639344, at *5 (E.D. Cal. Feb. 24, 2012) (action for civil penalties against mining equipment operator improperly permitted under state law was not removable because "Congress limited [Clean Air Act] preemption to emission standards, and declined to completely preempt the regulation of nonroad engines"); *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1281–86 (W.D. Tex. 1992) (remanding claims against stationary source polluter, finding "[t]he Clean Air Act does not create federal court jurisdiction" and "does not preempt source-state common law claims against a stationary source").

[18] *See Bell v. Cheswick Generating Station*, 734 F.3d 188, 198 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (allowing state tort claims to proceed against coal-fired power plant, holding that "[i]f Congress intended to eliminate such private causes of action, 'its failure even to hint at' this result would be 'spectacularly odd'"); *Merrick*, 805 F.3d at 690 (allowing claims for nuisance, trespass, and negligence for emissions from whiskey distillery because "the Clean Air Act expressly preserves the state common law standards on which plaintiffs sue"); *Keltner v. SunCoke Energy, Inc.*, No. 3:14-CV-01374-DRHPMF, 2015 WL 3400234, at *4 (S.D. Ill. May 26, 2015); *Bearse v. Port of Seattle*, No. C09-0957RSL, 2009 WL 3066675, at *4 (W.D. Wash. Sept. 22, 2009); *Tech. Rubber Co. v. Buckeye Egg Farm, L.P.*, No. 2:99-CV-1413, 2000 WL 782131, at *4–*5 (S.D. Ohio June 16, 2000); *Ford v. Murphy Oil U.S.A., Inc.*, 750 F. Supp. 766, 772–73 (E.D. La. 1990); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014).

34

in the Clean Air Act warranted complete preemption. 294 F. Supp. 3d at 938. "To the contrary, the Clean Air Act . . . contains savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'" *Id.* As the Supreme Court has explained, "Down to its very core, the Clean Air Act sets forth a federalism-focused regulatory strategy." *E.P.A. v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1617 (2014) ("*Homer*").

The "touchstone of the federal district court's removal jurisdiction is . . . the intent of Congress." *Metro. Life Ins. Co.*, 481 U.S. at 66. The best way to discern congressional intent is the text of the statute itself. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2185 (2014). Three provisions in the Clean Air Act definitively refute Defendants' contention that Congress intended the Act to completely preempt state law claims related to air-pollution emissions. Those provisions—none of which Defendants acknowledge—establish the opposite: Congress intended to preserve state law remedies for air pollution, to permit *more stringent* regulation than the Act's baseline.

First, the Act declares that "air pollution prevention . . . and air pollution control at its source is *the primary responsibility of States and local governments*," 42 U.S.C. § 7401(a)(3) (emphasis added), reflecting Congress's intent for state primacy in air pollution regulation. *See Homer*, 134 S. Ct. at 1617. The Supreme Court instructs caution in finding congressional intent to preempt (even with respect to ordinary preemption), and has emphasized "that the historic police powers of the States were not [meant] to be superseded by [a federal statute] unless that was the clear and manifest purpose of Congress." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002). That caution is particularly appropriate where, as here, the State seeks to enforce in state court state law that falls well within its historic police powers. *See In re MTBE Prods. Liab. Litig.*, F.3d 65, 95–96 (2d Cir. 2013) ("Imposing state tort law liability . . . falls well within the state's

35

historic powers to protect the health, safety, and property rights of its citizens. . . . [T]he presumption that Congress did not intend [the Act] to preempt state law tort verdicts is particularly strong."). The Supreme Court has found that the "presumption against federal preemption is clear . . . from the terms of [§ 7401.]" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 260 (2004).

Second, aside from limited exceptions not applicable here, nothing in the Act's chapter governing air quality and emissions limitations "shall preclude or deny the right of any State . . . to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution," except that no State or local government may "adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation" provided for by the Clean Air Act and its implementing regulations. 42 U.S.C. § 7416. By this provision, Congress made clear that the Act sets a *floor* for emissions standards and limitations, but does not limit States' rights to create and enforce stricter air pollution emission, control, and abatement standards.

Third, Congress included another savings clause, which specifies that "nothing in" the chapter governing citizen suits "shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." *Id.* § 7604(e). This provision clarifies that Congress did not intend the Clean Air Act to be the exclusive means of enforcing air quality standards, whether such standards are found in the Act itself or in some other source of law. *See, e.g.*, *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197–98 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (explaining that the Clean Air Act "serve[s] as a regulatory floor, not a ceiling," and thus "states are free to impose higher standards on their own sources of pollution, and . . . state tort law is a permissible way of

36

doing so") (citing *Ouellette*, 479 U.S. at 498–99 (interpreting Clean Water Act and coming to the same conclusion)).

Ignoring precedent and relevant provisions of the Act, Defendants rely on EPA's regulatory emissions standards to suggest that the Act completely preempts the State's claims. Not. of Rem. ¶ 40. However, the "exclusive statutory remedy for the regulation of greenhouse gas emissions" to which Defendants refer (*id.* ¶ 42), defines only the process for enforcing violations of emissions permits, which has nothing to do with the State's claims. Defendants' argument rests on the false premise that the State's claims are an "end-run around a petition for rule-making regarding greenhouse gas emissions." *Id.* ¶ 45; *see also id.* ¶ 44 ("[T]he alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions."). Defendants falsely argue that the State seeks to set emissions standards for sources worldwide, when the State seeks only damages and abatement of a nuisance within its boundaries through adaptation and mitigation measures. The State does not seek to enjoin any emissions from any source regulated under the Act, enforce or invalidate any Clean Air Act permit, nor create any other restriction whatsoever on air pollution conceivably governed by the Act.

Furthermore, Defendants cite no authority supporting the assertion that the Clean Air Act creates the sole remedy for the State's tort injuries. Defendants' reliance on *N.C. ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 46 (2011), is misplaced. *See* Not. of Rem. ¶ 40. That case was an *ordinary preemption* case that concerned subjecting a source in Alabama and Tennessee to North Carolina's nuisance law; it did not address complete preemption or suggest all state law claims were necessarily governed by the Clean Air Act. *Id.* at 306–09. Rather, the Fourth Circuit made clear that the sources at issue could have been subject to nuisance law of their home states, if those states' nuisance laws were as expansive as

North Carolina's. The limiting factor there was the scope of Tennessee's and Alabama's laws, not the Act's preemptive force. *N.C. ex rel. Cooper*, 615 F.3d at 309–10.

The Clean Air Act has nothing to do with the State's Complaint for damages and equitable relief from Defendants' conduct. Regardless, far from indicating congressional intent to completely preempt state law causes of action touching on air pollution (including those seeking abatement of air pollution), the Act expressly provides the opposite, *i.e.*, that Congress intended to preserve state law remedies related to air pollution, a subject Congress considered to be the primary responsibility of state governments. In that context, there is no basis for finding complete preemption. *See, e.g.*, *Her Majesty The Queen In Right of the Province of Ontario*, 874 F.2d at 343 (finding no complete preemption because the Act's savings clauses "compel[] the conclusion" that the Act did not preempt plaintiffs' state law claims); *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 95–96 (same).

### 2.   The Clean Air Act Does Not Create a Right of Action that Encompasses the State's Tort Claims.

In addition to the Clean Air Act's affirmative statements demonstrating congressional intent to preserve state law claims, complete preemption cannot operate here because of what the Clean Air Act does *not* contain: a private cause of action that could encompass the state law tort claims the State maintains. In the rare cases where the Supreme Court found complete preemption, it relied not only on congressional intent that federal law provided the exclusive remedy, but also on the presence on a specific federal cause of action that would have encompassed the plaintiff's state law claim. *See Beneficial Nat'l Bank*, 539 U.S. at 7–9; *Metro. Life Ins. Co.*, 481 U.S. at 62–63, 65–66; *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968). The First Circuit has explained that "[e]xclusive federal regulation alone might preempt state claims; but it is the further presence of a counterpart federal cause of action

38

that allows the state claim to be transformed into a federal one." *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 46 (1st Cir. 2008). That is not the case here.

Further, the Clean Air Act's citizen-suit provision creates a right of action only for violations of emissions standards or violation of an EPA order. *See* 42 U.S.C. § 7604. The Act does not regulate the marketing or promotion of fossil fuels at all, let alone create a right of action for related claims. Nor does the Act provide a right to compensatory damages or authorize equitable abatement funds. *See Freeman*, 848 N.W.2d at 69 (Clean Air Act did not preempt state tort action against corn milling facility for emissions and emphasizing distinction between remedies under state law and the Clean Air Act). Without any federal cause of action to remedy the State's injuries, complete preemption cannot transform state tort claims into federal claims.

Because Defendants have failed to identify any federal law completely preempting the State's state law claims, their assertions of conflict with federal law provide no basis for removal.

**D.      The State's Complaint Does Not Fall Within the Jurisdictional Grant of the Outer Continental Shelf Lands Act.**

The Complaint is not subject to federal jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), even under the extremely broad interpretation of the statute Defendants advocate (Not. of Rem. ¶¶ 47–53). Defendants' argument is specious. Their overbroad formulation of the OCSLA jurisdictional grant would bring into federal court not only this case, but any case involving facts traceable to deep sea oil drilling, no matter how far-flung and remote—for example, a routine personal injury action against a tanker truck driver stemming from an car accident in Tennessee would be removable simply because the tanker carried gasoline refined from oil extracted from the Outer Continental Shelf ("OCS"). That is not the effect or intent of the OCSLA, and Section 1349 cannot be read to generate such "absurd results." *Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014)

39

(remanding case alleging unlawful assignment of gas processing contract and unlawful closure of onshore pipeline valve, because activities that caused injury were not conducted on the OCS).

The OCSLA vests original jurisdiction in the district courts for claims concerning "damage resulting from injurious physical acts" conducted on the OCS, *Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014), where the dispute "alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 570 (5th Cir. 1994). Neither of those elements is satisfied here.

The First Circuit has not ruled on the outer limits of OCSLA jurisdiction, and Defendants instead rely on cases from the Fifth Circuit. The State does not concede that the Fifth Circuit's test is the correct one, nor that the First Circuit would adopt it, and in any case Defendants' arguments fail even under a maximally broad reading of those cases. The Fifth Circuit has held: "Courts typically assess jurisdiction under [§ 1349] in terms of whether (1) the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals, and (2) the case 'arises out of, or in connection with' the operation." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). "[T]he term 'operation' contemplate[s] the doing of some physical act on the" OCS. *See EP Operating Ltd. P'ship*, 26 F.3d at 567. And a plaintiff's case "arises out of, or in connection with" the operation when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), and (2) granting relief "thus threatens to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

40

Fifth Circuit courts have treated the OCSLA jurisdictional grant as broad, but have nonetheless held that "the 'but-for' test . . . is not limitless," and must be applied in light of the OCSLA's overall goals. *Plains Gas Sols.*, 46 F. Supp. 3d at 704–05. The

> argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results; under [such a] view, an employment dispute brought by an employee of an onshore processing facility would fall within the OCSLA because, but for the activities on the OCS, the facility and the employment relationship would not exist.

*Plains Gas Sols.*, 46 F. Supp. 3d at 705. "The Fifth Circuit has rejected such a universal application, recognizing that 'one can hypothesize a "mere connection" between the cause of action and the OCS operation too remote to establish federal jurisdiction.'" *Id.* (quoting *In re Deepwater Horizon*, 745 F.3d at 163).

The State's injuries here were not caused by, do not arise from, and do not interfere with physical "operations" on the OCS, as that term is used in the OCSLA. The State's injuries arise from the defective nature of Defendants' fossil fuel products, Defendants' injection of those products into the marketplace without sufficient warnings of their known dangers, and from the campaign of misinformation that undermined public understanding of those dangers—no matter where or by what "operations" the products' constituent elements were originally extracted. The Complaint does not distinguish between fossil fuels by location of extraction. *See, e.g.*, Compl. ¶ 3 ("The primary source of this pollution is the extraction, production and consumption of coal, oil, and natural gas, referred to collectively in this Complaint as 'fossil fuel products'"). Defendants' assertions that some Defendants "participate very substantially in the federal OCS leasing program," and that a "substantial" but undefined "portion of the national consumption of fossil fuel products stems from production on federal lands" (Not. of Rem. ¶ 51), do not mean that the State's injuries arose from "operations" on the OCS. The injuries stem from the nature of the products themselves, and Defendants' knowledge of their dangerous effects, not from the

41

"operations" used to extract them in raw form. District courts in the Fifth Circuit routinely refuse to exercise jurisdiction over cases tangentially related to mineral exploration and production on the OCS, where granting relief would have no effect on those operations, such as here.[19]

Defendants' cases finding OCSLA jurisdiction do not deviate from that general rule. In all of them, the injuries complained of were actually caused by physical activity actually occurring on the OCS related to oil and natural gas extraction, or were contract disputes directly concerning those activities. In *Deepwater Horizon*, for example, the Fifth Circuit upheld OCSLA jurisdiction for the plaintiffs' claims for injury to wildlife and aquatic life that happened as a direct result of the massive oil spill caused by the explosion of an offshore drilling rig. 745 F.3d at 162–64; *see also United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 406 (5th Cir. 1990) (contract dispute concerning natural gas pipeline running from OCS to Louisiana coast); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202 (5th Cir. 1988) at 1203 (dispute concerning "take-or-pay obligations in contracts for the sale/purchase of natural gas" from natural gas platform); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (dispute

---

[19] *See, e.g.*, *Parish of Plaquemines*, 64 F. Supp. 3d at 895 (no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that ultimately stretch to the OCS"); *Fairfield Indus., Inc. v. EP Energy E&P Co.*, No. CV H-12-2665, 2013 WL 12145968, at *5 (S.D. Tex. May 2, 2013), *report and recommendation adopted*, No. CV 4:12-2665, 2013 WL 12147780 (S.D. Tex. July 2, 2013) (no OCSLA jurisdiction over dispute regarding licensing agreement for pre-existing seismic data for Gulf of Mexico seabed, where "performance of the disputed contracts would not influence activity on the OCS, nor require either party to perform physical acts on the OCS"); *LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*, No. CIVA 06-11248, 2007 WL 854307, at *5 (E.D. La. Mar. 16, 2007) (no OCSLA jurisdiction over insurance dispute "regarding damages to production facilities that have already occurred" because suit "does not affect or alter the progress of production activities on the OCS, nor does it threaten to impair the total recovery of federally owned minerals from the OCS"); *Brooklyn Union Expl. Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("A controversy exclusively over the price of gas which has already been produced, as in the instant case, simply does not implicate the interest expressed by Congress in the efficient exploitation of natural resources on the OCS."); *see also St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 609 (D. Del. 2011) (granting motion to remand Florida law claims and observing that, "[w]hile the federal government has sovereignty on the Outer Continental Shelf, states still have the power to adjudicate claims arising from activities there; i.e., states have concurrent jurisdiction").

42

over contract for transportation and installation of offshore oil and gas platform). The OCSLA does not provide a basis for jurisdiction over this case in this Court.

### E. There Is No Enclave Jurisdiction Because the State's Claims Do Not "Arise" Within the Federal Enclave.

"Federal courts have federal question jurisdiction over tort claims that *arise on* 'federal enclaves.'" *Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1250 (9th Cir. 2006)* (emphasis added). Defendants' assertion that the State's claims arose within federal enclave(s) fails for at least three reasons. First, contrary to Defendants' arguments, the Complaint expressly disclaims injuries to any federal property in Rhode Island which consists of the four federal wildlife refuges and two Department of Defense facilities. Compl. ¶¶ 1 n.2, 12. Second, Defendants' assertions "on information and belief" that some of their alleged bad acts occurred on federal land are not supported by the Complaint. Finally, and most importantly, even if some portion of Defendants' tortious conduct did occur on federal land, the State's claims "arose" only once all the elements of the claim were complete, which, here, was only when and where the State suffered injuries, i.e. on non-federal land.

### 1. The State's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands.

The Complaint seeks to abate the nuisances caused by "sea level rise, drought, extreme precipitation events, heatwaves, other results of the changing hydrologic and meteorological regime caused by global warming, and associated consequences of those physical and environmental changes . . . on Rhode Island." Compl. ¶ 12. The State expressly *excludes* damage to federal property within and abutting the State's boundaries. *Id.* ¶¶ 1 n.2, 12 ("Rhode Island does not seek to impose liability on Defendants for harms other than those to the State").

*Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125 (W.D. Wash. 2017), is instructive. There, Monsanto removed the State of Washington's claims that Monsanto "contaminat[ed] water,

land, and wildlife throughout the state's territory with toxic chemicals called polychlorinated biphenyls ('PCBs')" that Monsanto manufactured, *id.* at \*1127, arguing in relevant part that some of the allegedly contaminated waters "are 'at or near' federal territories, including military bases." *Id.* at \*1132. The State moved to remand, "assert[ing] that it d[id] not seek damages for contamination to waters and land within federal territory, as it would not have standing to do so." *Id.* That representation satisfied the court that "because Washington avowedly does not seek relief for contamination of federal territories, none of its claims arise on federal enclaves," and granted the motion to remand. *Id.* Likewise here, the Complaint alleges that the State's injuries arise on non-federal land only. Compl. ¶¶ 1 n. 2, 12; *see also Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (rejecting enclave jurisdiction where plaintiff stipulated to not seek damages for wetland loss in federal wildlife reserve). There is therefore no basis to assert federal enclave jurisdiction based on the location of State's injuries.[20]

Second, Defendants argue that "[o]n information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves," and that "the Complaint relies upon conduct occurring in the District of Columbia." Not. of Rem. ¶¶ 71, 72. However, neither assertion is supported by the allegations in the Complaint. Defendants state that some portion of some Defendants' fossil fuel extraction has occurred on federal land, but cite no allegation in the Complaint referring to those lands or to conduct occurring there. Defendants also

---

[20] Defendants' reliance on *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 370 (1964), and *Mississippi River Fuel Corp. v. Cocrehan*, 390 F.2d 34, 35 (5th Cir. 1968), (Not. of Rem. ¶ 71), is misplaced. Both cases held that a state may not exercise its taxing power over oil and gas drilling and pipeline operations located entirely within the federal enclave. Neither analyzed where a state law tort cause of action arises for enclave jurisdiction purposes—let alone whether injuries sustained on exclusively non-federal land could be subject to enclave jurisdiction, as Defendants urge. Neither case can be read for that proposition.

refer to their trade association memberships and financing of think tanks and lobbyists (described at Compl. ¶¶ 171–73). Defendants have not met their burden to identify how such facts provide any basis for enclave removal here.[21]

### 2. Each of the State's Claims Arose Only Once a Complete Tort Existed, Which in This Case Occurred When and Where the State Suffered Injury—on Non-Federal Lands.

Even if Defendants' Notice of Removal accurately described the contents of the Complaint, federal enclave jurisdiction would still not be proper because the State's claims "arose" only at the time and place where all the elements of the claims were complete, forming an actionable tort. The elements of the State's claims are defined by substantive Rhode Island law, and each claim includes an injury element. Because the injuries complained of occurred and will occur within the State's jurisdiction, those claims "arose" within the State's boundaries, and none "arose" within a federal enclave.

A tort cause of action "arises," for enclave purposes, when and where the underlying tort is complete. *Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *1 (N.D. Cal. Apr. 6, 2011) (finding enclave jurisdiction in defamation action because "publication—*the last event necessary to render the tortfeasor liable*" occurred in a federal enclave); *see also Bordetsky v. Akima*

---

[21] The few cases Defendants cite to support their District of Columbia argument have nothing to do with removal, and do not even discuss the Enclave Clause as a basis for the court's jurisdiction. The court in *Jacobsen v. U.S. Postal Service*, 993 F.2d 649, 652 (9th Cir. 1992), considered whether "ingress-egress walkways" at federal post offices are public fora under the First Amendment. The opinion does not address any jurisdictional issue and does not mention the Enclave Clause. *Id. Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014), was an excessive force action against a District of Columbia police officer, in which the court observed in dicta that "[b]ecause the District of Columbia is a federal enclave, it is subject to the Fifth Amendment, and not the Fourteenth, which applies to the States." The court did not discuss or cite the Enclave Clause, and jurisdiction existed because the plaintiff expressly brought claims under the Constitution and 42 U.S.C. § 1983. *Id.* at 14. Finally, *Hobson v. Hansen*, 265 F. Supp. 902, 906 (D.D.C. 1967), held in relevant part that a statute vesting power to appoint members of the District of Columbia Board of Education in D.C. district court judges was constitutional under the Enclave Clause.

*Logistics Servs., LLC*, No. CV 14-1786 (NLH/JS), 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016) ("When dealing with a federal enclave, the focus is on where the tort occurred."); *Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*, No. CV-12-RRA-1874-NE, 2012 WL 12897212, at *10 (N.D. Ala. Dec. 6, 2012) ("Whether courts look to the 'locus,' 'nexus,' 'pertinent events,' or 'elements,' the one consistent approach [is] that they looked to the state law which created the claim to determine where it arose."), *objections overruled*, No. 5:12-CV-1874-RRA, 2013 WL 12147712 (N.D. Ala. May 29, 2013).[22]

Here, each of the State's claims has an injury element, and therefore each claim arose only when and where the State suffered injury. Stated differently, the State could not have brought suit before the injuries occurred, because the causes of action had not arisen – "all civil actions shall be commenced . . . after the cause of action shall accrue." R.I. Gen. Laws § 9-1-13. In turn, a cause of action generally accrues at the "time of injury" or when the "injury or some wrongful conduct should have, in the exercise of reasonable diligence, been discovered" *See Renaud v. Sigma-Aldrich Corp.*, 662 A.2d 711, 714-15 (R.I. 1995). The State's First Cause of Action is for public nuisance, Compl. ¶¶ 225–37, and "the essential element of an actionable nuisance is that the

---

[22] The cases Defendants cite that consider the issue in detail perform the same analysis as in *Totah*, looking to where all elements forming the cause of action were complete to determine where the claim arose. *See Sparling v. Doyle*, No. EP-13-CV-00323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014) (observing that the "key factor" for finding enclave jurisdiction is "the location of the plaintiff's injury or where *the specific cause of action* arose," and finding jurisdiction where all parties agreed all relevant conduct and injuries occurred at Fort Bliss (emphasis added)); *Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (rejecting jurisdiction where plaintiff disclaimed any injuries to land in federal enclaves, such that defendant could not show that "Defendants' [dredging activities] took place on a federal enclave or the damage complained of—coastal erosion—occurred on a federal enclave"). The remainder of Defendants' cases, inapplicable here, hold that where a personal injury action arises from a discrete occurrence at a military facility, enclave jurisdiction is proper. *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) (personal injury action based on discrete incidents of asbestos exposure at military bases was subject to enclave jurisdiction); *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) (finding jurisdiction over asbestos personal injury action where all alleged injurious exposures occurred on naval bases during employment by naval contractor).

plaintiffs have suffered harm or are threatened with *injuries* that they ought not to have to bear." *Weida v. Ferry*, 493 A.2d 824, 826 (R.I. 1985) (emphasis added). The State's Second, Third, Fourth, and Fifth Causes of Action are product liability claims for failure to warn and design defect, alleging strict liability and negligence theories. Compl. ¶¶ 238–84. Each requires the State to prove it was *injured* by Defendants' tortious conduct. *See Ritter v. Narragansett Elec. Co.*, 283 A.2d 255, 261 (R.I. 1971) (adopting strict products liability causes of action from Restatement Torts 2d § 402(A), including injury element); *see also Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446, 451 (R.I. 2013) (injury is an element of a negligence claim). The State's Sixth Cause of Action for trespass, Compl. ¶¶ 285–93, "arises" when (and where) the defendant's injurious entry occurs. *Herreshoff v. Tripp*, 23 A. 104, 105 (R.I. 1885).[23] Thus, the "consummation of the tort[s] occur[ed] when and where" the State suffered injury. *See Totah*, 2011 WL 1324471, at *2. But here, the State's alleged injuries occurred on non-federal land only, and federal enclave jurisdiction is therefore improper.

**F.      The State's Claims Are Not Removable Under 28 U.S.C. § 1442(a)(1) Because Defendants Are Not "Acting Under Federal Officers."**

To remove under 28 U.S.C. § 1442(a)(1), a defendant must show that "(1) it was acting under the direction of a federal officer; (2) it has a colorable federal defense; and (3) that there is a causal connection between the acts taken under federal direction and a plaintiff's claim(s) against it." *Shepherd v. Air & Liquid Sys. Corp.*, No. CA 12-143L, 2012 WL 5874781, at *2 (D.R.I. Nov. 20, 2012) (citing *Mesa v. California*, 489 U.S. 121 (1989)). "Because federal officer removal is

---

[23] Defendants make no attempt to shoehorn the State's Seventh Cause of Action under the state constitution and Eighth Cause of Action under the state Environmental Rights Act into Federal Enclave jurisdiction. *See* Not. of Rem. ¶ 68 (noting that federal enclave jurisdiction extends to tort claims); *see also* Compl. ¶¶ 294–315. Because these claims explicitly address injuries to public trust resources within Rhode Island, Compl. ¶¶ 301–02, 311–12, there is no question that they arise in Rhode Island, and not in a federal enclave.

47

rooted in 'an anachronistic mistrust of state courts' ability to protect and enforce federal interests and immunities,'" Section 1442 must be "read narrowly" when applied to private parties. *See Mobley v. Cerro Flow Prod., Inc.*, No. CIV 09-697-GPM, 2010 WL 55906, at *3 (S.D. Ill. Jan. 5, 2010) (quoting *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1150, 1152 n.6 (D. Colo. 2002)). "[P]rivate actors seeking to benefit from [§ 1442] bear a special burden of establishing the official nature of their activities." *Freiberg*, 245 F. Supp. 2d at 1150.

Defendants contend that, because some of them have participated in economic agreements with federal entities related to fossil fuel extraction and sale over the last century, those Defendants were acting under federal officers within the meaning of Section 1442(a)(1). Rejecting a nearly identical gambit, the court in *San Mateo* characterized the federal officer removal argument as "dubious," and emphasized that "defendants have not shown a 'causal nexus' between the work performed under federal direction and the plaintiffs' claims, which are based on a wider range of conduct." 294 F. Supp. 3d at 939.

### 1. Defendants Have Not Shown They "Acted Under" Federal Officers.

Although Defendants do not purport to *be* federal officers, they contend that a subset of them were "acting under" federal officers when they extracted and sold fossil fuels pursuant to occasional contracts with the federal government. Not. of Rem. ¶¶ 56–65. To prove that it was acting under a federal officer within the meaning of Section 1442(a)(1), however, a defendant must establish both that it was "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior" and that its relationship with the federal superior "involve[d] 'subjection, guidance, or control.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151–52 (2007). In *Watson*, plaintiffs sued Philip Morris in state court for unfair business practices and deceptive conduct related to manipulating cigarette tests to obtain a lower tar and nicotine result that could

48

be used to market the cigarettes as "light." *Id.* at 146. The Supreme Court rejected the tobacco company's federal officer removal, holding that even in a heavily regulated industry, a private company does not "act[] under" an officer of the United States unless it is "lawfully assist[ing]" the federal officer "in the performance of his official duty." *Id.* at 151. None of the tortious conduct the State challenges was taken under the guidance or control of any federal officer. Defendants therefore cannot remove their claims pursuant to Section 1442(a)(1).[24]

Defendants contend generally that "many Defendants have long explored for and produced minerals, oil, and gas on federal lands pursuant to leases governed by the Outer Continental Shelf Lands Act." Not. of Rem. ¶ 56. Those leases, Defendants assert, "required" Defendants "to conduct" exploration, development and production activities" and "obligate[d] lessees like Defendants" to "carry[] out exploration, development and production activities approved by Interior Department officials" while complying "with all applicable regulations, orders, written instructions, and the terms and conditions set forth in" the leases and in project-specific development, production, and exploration plans. *Id.* ¶¶ 56–57. In support of their arguments, Defendants rely on two leases, which are presumably representative. *Id.* ¶ 57 & Exhs. B & C. Nothing in those leases supports that the extraction and exploration activities Defendants undertook pursuant to such leases was anything more than a commercial transaction.

First, when a corporation makes an uncoerced decision to enter into a lease agreement with the federal government for the purpose of finding and extracting fossil fuels, it makes a choice that

---

[24] Defendants also fail to establish that they were helping a government official perform a government function—*i.e.*, that they were "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior"—as required to establish that they were acting under a federal officer. *Watson*, 551 U.S. at 152. Defendants rely exclusively on their commercial relationship with federal entities arising out of leasing land or selling an off-the-shelf commodity to the government. But Defendants identify no case in which such a garden-variety commercial relationship gave rise to acting-under removal jurisdiction.

49

is free from the "subjection, guidance, or control," of the federal government. *Watson*, 551 U.S. at 152. Defendants do not cite any case where a voluntary choice by a private party to lease property or mineral rights from the federal government automatically transformed later activity involving the lease agreement into activity under the control of a federal officer.

The Supreme Court has held unambiguously that "the help or assistance necessary to bring a private party within the scope of the statute does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152. That holding is not limited to compliance with general statutory law applicable to the general population. Rather, the Court specifically held that

> a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. . . . And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Id.* at 153.[25] Something more than simply following federal rules or guidelines is required to establish the requisite acting-under relationship; Defendants have not satisfied that requirement.

Third, the contractual obligations in the leases do not include the type of detailed direction that could demonstrate the necessary federal "subjugation, guidance, or control." *See Watson*, 551 U.S. at 152. Defendants allege that the leases imposed extensive government control over the process of extracting fossil fuels, an inspection of the leases shows that is not so. The leases did not require Defendants to extract fossil fuels in a particular manner, did not dictate the composition of oil or gas that would later be refined and sold, and did not purport to affect the content or methods of Defendants' communications with consumers about Defendants' products. Nothing in the leases controlled any of the actions that form a basis for liability under the State's claims.

---

[25] *See also, e.g.*, *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 663 n. 14 (E.D. Tex. 1999) (rejecting federal officer removal and stating that "Defendants can bury this Court in federal government regulations controlling their actions. But if there is no causal nexus between Defendants' actions in response to this control and the Plaintiffs' claims, then the government did not "make them do it" since the "it" was never under government control.").

Defendants err in seeking refuge in the First Circuit's decision in *Camacho v. Authoridad de Teléfonos de Puerto Rico*, 868 F.2d 482 (1st Cir. 1989). *See* Not. of Rem. ¶ 55. In *Camacho*, targets of federal wiretapping sued telephone companies and officials who participated in wiretapping "strictly and solely at federal behest." *Id.* at 486. The First Circuit held that removal was proper because the defendants were acting under "express orders, control and directions of federal officers." *Id.* But *Camacho*—where the cause of action directly challenged the defendants' role in assisting federal agents pursuant to a federal court order—is of little relevance here, where the challenged conduct instead relies on deceptive product promotion that not only lacked federal authorization, but also was *concealed from* the federal government. *See, e.g.*, Compl. ¶¶ 6, 229.

Defendants have not shown that the OCS leases directed the manner of extraction; directed the subsequent composition of the resulting product; or directed the manner in which Defendants communicated with consumers, regulators, and the public.[26] As already discussed, Defendants' claim that the leases require them to extract or sell a certain amount of oil or gas is a consequence of their voluntary commercial decision to seek out leases with the government, not any government compulsion or direction sufficient to invoke federal officer removal. Defendants have failed to establish that the leases attached as Exhibits B and C created an "acting under" relationship that gives rise to removal jurisdiction under Section 1442(a)(1).

---

[26] *Compare Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399–400 (5th Cir. 1998) (manufacturers of Agent Orange were acting under a federal officer for purposes of tort claims related to product composition and lack of warning where the federal government imposed "detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and refused to allow a warning on the product), *with In re MTBE Prods. Liab. Litig.*, 488 F.3d at 131 (refusing federal officer removal because "while federal regulations . . . have much to say about gasoline content, they allow refiners to use any of several additives to meet federal . . . requirements and say nothing regarding the marketing of gasoline containing MTBE, a highly dangerous compound that, like tar and nicotine, poses a threat to human health").

Defendants next rely on a 1944 contract between Standard Oil (a Chevron predecessor) and the U.S. Navy governing the "joint operation and development" of the Elk Hills Reserve, a strategic petroleum reserve maintained by the Navy and that comprised a common underground pool spanning properties owned by the Navy and Standard Oil. Not. of Rem. ¶ 58; *see also United States v. Standard Oil Co. of Cal.*, 545 F.2d 624 (9th Cir. 1976); *Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747 (2013). With a goal of maintaining a minimum level of fossil fuels in the shared underground pool, the contract on which Defendants rely limited the amount Standard Oil was permitted to extract from the reserve. Not. of Rem. ¶ 58. But nothing in that contract directed Standard Oil to produce a particular product for government use, to extract oil in a particular manner, or to communicate with the public about its product in a particular way. Indeed, Standard Oil could have complied with the contract by extracting, producing, and selling *no oil at all*. It is far-fetched for Defendants to now claim that their decisions about extraction under that contract—and their decisions about what to do with the oil they extracted—were somehow compelled by the contract. Nothing in it provides even a whiff of "subjection, guidance, or control" needed to establish that Defendants were acting under a federal officer. *See Watson*, 551 U.S. at 152. The 1944 contract therefore provides no basis for removal.

Finally, Defendants rely on certain commercial contracts under which at least one Defendant agreed to supply fuel to the Navy Exchange Service Command (NEXCOM), which in turn served as a retailer reselling the fuel at a discount to active duty military, retirees, reservists, and their families. Not. of Rem. ¶ 65. Again: a company's voluntary decision to sell a commodity to the government does not render it a federal officer in cases alleging the product was defective or that defendants' behavior was otherwise tortious. Although the Supreme Court recognized in *Watson* that "[t]he words 'acting under' are broad," it simultaneously recognized that such "broad

52

language is not limitless." 551 U.S. at 147. Under Defendants' logic, any manufacturer of any product would be entitled to remove any state law product liability claim against it if the manufacturer sold one of its products to a government entity at some point in time. Such an expansive view of Section 1442(a)(1) would ignore its historical purpose of preventing state court interference with or prejudice against federal operations. *Id.* at 150, 152. Defendants' approach also makes no sense; when a corporation sells its product to an arm of the federal government, it does not give the government control over the nature and composition of the product, nor does it magically transform its own decisions about whether to share truthful information about the product with the public into government-directed decisions.

To the extent Defendants suggest that the NEXCOM contract was something more than a mere commodity-purchase arrangement, they fail to substantiate that claim. Defendants have not proffered an example of such a contract, instead relying on a bare allegation that their agreements with NEXCOM "contained detailed fuel specifications." Not. of Rem. ¶ 65. That is insufficient to carry Defendants' burden of establishing removal jurisdiction. Defendants fail to establish or even allege that the "detailed fuel specifications" caused Defendants to produce, sell, or communicate in a particular way about the fuel they sold to the government in a manner that could have given rise to the State's injuries. Defendants do not contend, for example, that the fuel they sold pursuant to that contract differed in any respect from the fuel they sold at roadside service stations generally, before becoming a party to the contract.

### 2. No Causal Nexus Exists Between Defendants' Actions Challenged in This Case and the Directions of Any Federal Officer.

Federal officer jurisdiction also requires that the defendant establish a "causal connection" between the acts it performed under the government's direction and the plaintiff's claims. *Mesa*, 489 U.S. at 121. Because there was no delegation of authority from federal agencies to Defendants,

53

nor direct control by those agencies over Defendants' challenged conduct, a causal nexus is necessarily absent. Moreover, regardless of the degree of federal control, the causal connection is still insufficient because the State's claims have nothing to do with anything Defendants allege they have done under the federal direction. Specifically, Defendants have not demonstrated that the government had any role in Defendants' promotion and marketing of fossil fuel products, along with simultaneous concealment of the known hazards of these projects. *See e.g.*, *In re MTBE Prods. Liab. Litig.*, 488 F.3d at 112 (no causal nexus to justify federal officer removal where federal regulations "say nothing" about marketing and other tortious conduct); *Meyers v. Chesterton*, No. CIV.A. 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn"). The sparse record of government leases and contracts Defendants cite, moreover, is "simply too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiff's claims." *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016). Defendants' association with the federal government is too attenuated to support jurisdiction for "acting under" federal officers. *See also San Mateo*, 294 F. Supp. 3d at 939.

### G.    The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C §§ 1452(a) and 1334.

#### 1.    The State Brings This Action Pursuant to Its Police and Regulatory Powers, and 28 U.S.C. § 1452(a) Expressly Does Not Apply to Police Power Actions.

The Complaint presents "a civil action by a governmental unit to enforce such governmental unit's police or regulatory power," which is expressly outside the statute's scope:

> A party may remove any claim or cause of action in a civil action *other than* a proceeding before the United State Tax Court or *a civil action by a governmental unit to enforce such unit's police or regulatory power*, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

54

28 U.S.C. § 1452(a) (emphasis added). As the district court in *San Mateo* recently held, state law actions addressing climate change impacts on municipal infrastructure and resources are exercises of police power "aimed at protecting the public safety and welfare," and therefore not subject to bankruptcy removal. 294 F. Supp. 3d at 939. The same result holds here.

The First Circuit applies two interrelated inquiries—the public purpose and pecuniary purpose tests—to decide whether an action is an exercise of a governmental entity's police and regulatory power. *In re McMullen*, 386 F.3d 320, 325 (1st Cir. 2004); *see also In re Spookyworld, Inc.*, 346 F.3d 1, 9 (1st Cir. 2003) (in context of automatic stay provision, town's enforcement of public safety measures fell within police power exception).[27] These inquires ask the court to

> [a]ssess[] the totality of the circumstances, [and] determine whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, *or* represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties.

*In re McMullen*, 386 F.3d at 325.

Here, the State seeks to protect public safety and welfare by abating, and paying to correct, the "cascading social and economic impacts" that follow from the physical impacts of Defendants' conduct. *See, e.g.*, Compl. ¶ 18. Far from being brought to "reap[] a financial windfall" (Not. of Rem. ¶ 76), the relief sought seeks not to protect any interest held by the State in any bankruptcy debtor's property, but to remediate public harm and protect the public well-being. *See, e.g.*, *id.* ¶¶ 1, 8, 212. There is no requirement that the government have no pecuniary motive whatsoever

---

[27] The statutory language of the removal exception for police and regulatory functions is practically identical to language exempting government enforcement actions from the automatic stay in bankruptcy proceedings under 28 U.S.C. § 362(b)(4), and therefore courts look to cases interpreting § 362(b)(4) for guidance in interpreting § 1452(a). *Massachusetts v. New England Pellet, LLC*, 409 B.R. 255, 258 (D. Mass. 2009); *City & Cty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1123 (9th Cir. 2006) (holding that the two statutes were designed to work in tandem and should be interpreted consistently).

when exercising its police powers, so long as the action is "*primarily* seeking to protect the public welfare." *Massachusetts v. New England Pellet, LLC*, 409 B.R. 255, 259 (D. Mass. 2009) (remanding state's unfair business practices claim that sought, *inter alia*, civil penalties, fees, and restitution); *In re Universal Life Church*, 128 F.3d 1294, 1298–99 (9th Cir. 1997) (acknowledging that "most government actions which fall under this exemption have some pecuniary component," and holding that "[t]his does not abrogate their police power function"). And punitive damages serve not to enrich the State, but instead to deter harmful conduct, and therefore do not abrogate the police power function exercised by the State. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 & n.9 (2008); *see also California ex rel. Brown v. Villalobos*, 453 B.R. 404, 412–13 (D. Nev. 2011) (request for civil penalties, disgorgement, and restitution remedies did not convert a governmental unit's police-power action into a solely pecuniary action sufficient for removal).

Under any conception of the scope of bankruptcy removal, the State's causes of action are exempt, and jurisdiction is absent. *See San Mateo*, 294 F. Supp. 3d at 939; *see also In re MTBE Prods. Liab. Litig.*, 488 F.3d at 133 (states' claims fell within police power exception because "the clear goal of these proceedings is to remedy and prevent environmental damage with potentially serious consequences for public health, a significant area of state policy").

### 2. The State's Actions Are Not "Relate[d] to" Any Bankruptcy Case.

Even if the State were not exercising its police and regulatory powers, removal still would not be appropriate under 28 U.S.C. §§ 1452(a) and 1334 because the State's claims are not "relate[d] to" any bankruptcy case or estate. Specifically, Section 1452(a) only allows for removal of claims arising "under section 1334 of this title." In turn, Section 1334(b) vests district courts with original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Although each subclause in Section 1334(b) has been interpreted to create

56

its own basis for jurisdiction, here Defendants assert only the "related to" subclause applies. *See* Not. of Rem. ¶ 73.

Prior to confirmation of a Chapter 11 plan, "related to" jurisdiction encompasses matters that "could conceivably have any effect on the estate being administered in bankruptcy." *In re Santa Clara Cty. Child Care Consortium*, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998). After a debtor's bankruptcy plan is confirmed, however—as is the case with both Texaco Inc. ("Texaco," a current subsidiary of Defendant Chevron) and Defendant Getty Petroleum Marketing, Inc. ("Getty")—the bankruptcy court's "related to" jurisdiction is substantially narrower and requires the claims to have a "particularly close nexus" to a reorganized debtor's confirmed plan. *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005) ("*Boston Reg'l*") (defining exception to narrowing of "related to" jurisdiction where bankrupt debtor ceased operations after plan confirmation)); *see also In re Enivid, Inc.*, 364 B.R. 139, 147 (Bankr. D. Mass. 2007) ("there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan"). [28] There is no "close nexus" where the matter at issue "could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010) (no "related to" jurisdiction over claims brought by a would-be real estate purchaser against debtor and actual purchaser following plan

---

[28] The bankruptcy court's jurisdiction is necessarily limited following confirmation because the overriding policy of the bankruptcy code is to provide the debtor with a "fresh start"—contingent in the Chapter 11 context on the debtor's unsupervised fulfillment of the reorganization plan. The First Circuit has explained:

> a reorganized debtor is emancipated by the confirmation of a reorganization plan. It emerges from bankruptcy and enters the marketplace in its reincarnated form. From that point forward, it is just like any other corporation; "it must protect its interests in the way provided by the applicable non-bankruptcy law," without any special swaddling.

*Boston Reg'l.*, 410 F.3d 100, 106 (1st Cir. 2005) (citations omitted).

57

confirmation, even though action involved interpretation of the bankruptcy court's sale order).

There is no "close nexus" between the State's causes of action and either Texaco or Getty's confirmed Chapter 11 plans.[29] *See* Not. of Rem. ¶ 75. Resolving this case in no way requires the Court to answer a bankruptcy law question or interpret, implement, consummate, execute, or administer either confirmed plan. *See Boston Reg'l*, 410 F.3d at 107. Considering identical arguments, the district court in *San Mateo* found, "to the extent two defendants' bankruptcy plans [were] relevant, there [was] no sufficiently close nexus between the plaintiffs' lawsuits and the[] defendants' plans." 294 F. Supp. 3d at 939. Thus, the requisite "close nexus" is also absent here. *See T & K Asphalt Servs., Inc. v. DDRC Gateway, LLC*, 976 F. Supp. 2d 38, 42 (D. Mass. 2013) (remanding where only "relation to" bankruptcy was hypothetical indemnity claim against a non-party subsidiary of a defendant).

Defendants nebulously argue that the Complaint involves "historical activities of Defendants, including predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged," and there are "hundreds of non-joined necessary and indispensable parties," and therefore "there are many other Title 11 cases that may be related." Not. of Rem. ¶ 74. Defendants do not assert, let alone establish, that any of the historical activities have a "close nexus" with bankruptcy law, precluding the Court from even assessing whether there is a "relation to" a bankruptcy plan. *Boston Reg'l*, 410 F.3d at 107 ("The existence vel non of related to jurisdiction must be determined case-by-case."). The State's causes of action "could have existed entirely apart from the bankruptcy proceeding and d[o] not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624

---

[29] *See In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. Mar. 23, 1988) (order confirming Chapter 11 plan); *In re Getty Petroleum Mktg. Inc. et al.*, No. 11-15606, ECF No. 714 (Bankr. S.D.N.Y. Aug. 24, 2012) (same).

F.3d at 1135.

### 3. Equity Demands That This Case Be Remanded to State Court.

Even if this action could be found to be "related to" a bankruptcy proceeding—which it cannot—equity demands remand to state court. A bankruptcy-related claim removed under Section 1452 may be remanded "on any equitable ground." 28 U.S.C. § 1452(b). This standard represents "an unusually broad grant of authority" that "subsumes and reaches beyond all of the reasons for remand under nonbankruptcy removal statutes." *In re McCarthy*, 230 B.R. 414, 417 (B.A.P. 9th Cir. 1999). Courts in the First Circuit generally weigh several factors when deciding questions of remand under Section 1452:

> (1) the effect of the action on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty of applicable state law; (4) comity; (5) the relatedness or remoteness of the action to the bankruptcy case; (6) the existence of a right to a jury trial; and (7) prejudice to the party involuntarily removed from state court.

*In re Santa Clara Cty. Child Care Consortium*, 223 B.R. at 46; *see also Messerlian v. A.O. Smith Corp.*, No. C.A. 09-393 S (WES) (LDA), 2010 WL 308981, at *4 (D.R.I. Jan. 25, 2010) (remanding state law personal injury case where removal was "primarily about defense strategy and not bankruptcy administration").

Every factor weighs in favor of remand here. As noted, the two bankruptcy cases Defendants identified have already been confirmed, and this action will not affect the administration or implementation of those plans. The Complaint is based entirely on state law claims and "comity counsels in favor of state-court resolution of state-law claims." *Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*, No. CIV.A. 11-10952-GAO, 2012 WL 769731, at *4 (D. Mass. Mar. 9, 2012). There is no open bankruptcy case with respect to any defendant, let alone a related action. The State seeks a jury trial which is unavailable in bankruptcy court. The interests of equity compel the Court to remand pursuant to 28 U.S.C. § 1452(b).

59

**H.   There Is No Admiralty Jurisdiction, and Admiralty Jurisdiction Cannot Serve as a Ground for Removal**

Although the Constitution bestows federal courts original—but not exclusive—jurisdiction over admiralty and maritime claims, U.S. Const. art. III, § 2, cl. 1, 28 U.S.C. § 1333 protects a plaintiff's right to have state law admiralty claims heard in state court, and thus Section 1441 prohibits removal on the basis of such claims. Nor do the State's claims arise in admiralty at all. A tort claim comes within admiralty jurisdiction only when it satisfies both the "location" and "connection to maritime activity" tests. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *Ardente v. Brunswick Corp.*, 58 F. Supp. 3d 193, 195 (D.R.I. 2014). Defendants have not established that the State's claims satisfy either test, and indeed, the only court to decide the issue of admiralty jurisdiction in the context of a climate change case rejected it as a basis for removal. *See Cty. of Santa Cruz v. Chevron Corp.*, et al., Case No. 3:18-cv-00450, Doc. No. 142, at 1 (N.D. Cal. July 10, 2018) (granting remand climate change tort cases brought by California municipalities and rejecting removal on admiralty grounds for the reasons stated in *Coronel v. AK Victory*, 1 F. Supp. 3d 1175 (W.D. Wash. 2014)).

**1.   Admiralty Jurisdiction Is Not a Basis for Removal.**

Even if the State's claims arose in admiralty, which they do not, state law admiralty claims brought in state court are not removable under 28 U.S.C. § 1441 absent some other jurisdictional basis, such as diversity or federal question jurisdiction. *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371 (1959); *Rafter v. Stevenson*, 680 F. Supp. 2d 275, 280 (D. Me. 2010).

Federal courts' admiralty jurisdiction "is 'exclusive' only as to those maritime proceedings in rem, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description." *Madruga v. Superior Court of State of Cal.*, 346 U.S. 556, 561 (1954). There is no plausible basis to characterize the State's case as in rem proceeding, and federal jurisdiction

60

could not be exclusive here. For in personam cases like this one, the "saving to suitors" clause in 28 U.S.C. § 1333 "leave[s] state courts competent to adjudicate maritime causes of action." *Madruga*, 346 U.S. at 560 (quotations omitted). Here, the State exercised its congressionally protected right to file state law claims in state court, and Section 1333 prohibits Marathon from removing on the basis of admiralty.

The 2011 amendments to Section 1441 do not disrupt this well-established rule which has persisted "throughout the history of federal admiralty jurisdiction—from the Judiciary Act of 1789 through *Romero* and up to the present." *Coronel v. AK Victory*, 1 F. Supp. 3d 1175, 1187 (W.D. Wash. 2014); *see also Messier v. Ace Am. Ins. Co.*, No. 12-cv-892-JD, 2013 WL 5423716, at *3 (D.R.I. Sept. 28, 2013) (after 2011 amendments, "even if admiralty or maritime jurisdiction exists in this case, that is not a sufficient basis for removal."). Nothing in those amendments suggests any intent to disturb the plaintiff's choice of forum protected by the "saving to suitors" clause. *See* Pub. L. No. 112-63, 125 Stat. 758 (Dec. 7, 2011) ("Federal Courts Jurisdiction and Venue Clarification Act"). As amended, Section 1441 allows removal of civil actions in the original jurisdiction of the federal courts "[e]xcept as otherwise expressly provided by Act of Congress." Under *Romero*, the savings clause of Section 1333 is just such an exception, because "it was unquestioned aim of the saving clause of 1789 to preserve" concurrent state court jurisdiction over admiralty matters and the "historic option of a maritime suitor pursuing a common-law remedy to select his forum." 358 U.S. 371–72.[30]

---

[30] While a handful of district courts in the Fifth Circuit have held that the 2011 amendments to Section 1441 now authorize removal of in personam admiralty claims, *see Ryan v. Hercules Offshore, Inc.*, 945 F. Supp. 2d 772, 778 (E.D. Tex. 2013), the validity of those cases is in doubt; the court that authored *Ryan* has since determined based on developing case law and commentary that maritime cases cannot be removed absent an independent basis for jurisdiction. *See Sanders v. Cambrian Consultants*, 132 F. Supp. 3d 853, 858 (S.D. Tex. 2015). Meanwhile, the vast majority of courts have affirmed the longstanding rule that savings clause

Marathon mischaracterizes the few cases it cites in support of its position. *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 817 (7th Cir. 2015), flagged the issue of maritime removability after the Section 1441 amendments but declined to reach it because the plaintiffs waived any "saving to suitors" argument. *See also Brown v. Porter*, 149 F. Supp. 3d 963 (N.D. Ill. 2016) (rejecting *Lu Junhong*'s position as dicta and holding that the "saving to suitors" clause prohibited removal). *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150 (5th Cir. 1996), was not a savings clause case because, unlike here, the OCSLA provided a separate ground for removal, *id.* at 155–56, and the Fifth Circuit has since reinforced the traditional rule that maritime claims filed in state court "are exempt from removal by the 'saving-to-suitors' clause . . . and therefore may only be removed when original jurisdiction is based on another jurisdictional grant, such as diversity of citizenship." *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 219 (5th Cir. 2013). In sum, admiralty is not a valid basis for removal here.

### 2. No Tort Has Caused Injury on Navigable Water, and No Vessel on Navigable Water Has Caused an Injury on Land.

Even if admiralty was a sufficient basis for removal, the State's claims are not claims in admiralty. Marathon does not satisfy the *Grubart* "location" test, which requires either that the tort occurred on navigable water or that injury suffered on land was caused by a vessel on navigable water. 513 U.S. at 534.

---

cases cannot be removed absent a non-admiralty ground for federal jurisdiction. *See, e.g.*, *Averill v. Fiandaca*, Case No. 2:17-cv-00287-JDL, 2017 WL 4419242, at *3 (D. Me. Oct. 5, 2017) (granting remand because "the saving-to-suitors clause permits Plaintiff to elect to pursue state law remedies in state court"); *Boudreaux v. Glob. Offshore Res., LLC*, No. CIV.A. 14-2507, 2015 WL 419002, at *3 (W.D. La. Jan. 30, 2015) (collecting cases and siding with majority view that savings clause cases are not removable); *Coronel*, 1 F. Supp. 3d at 1187 (reviewing the history of admiralty jurisdiction and the 2011 amendments to Section 1441, and concluding that "28 U.S.C. § 1333 alone does not provide federal subject matter jurisdiction over maritime claims on the law side of the court").

The *Oakland* court's characterization of coastal land flooding as "the very instrumentality of plaintiffs' alleged injuries," *Oakland*, 2018 WL 1064293, at \*5, finds no support in the law of admiralty, which makes clear that a tort occurring on land only falls within admiralty if the "instrumentality" of that injury was a *vessel*. *See* 46 U.S.C. § 30101(a) (extension of admiralty jurisdiction for injury "caused by a vessel on navigable waters . . . consummated on land"). Despite Marathon's arguments, the production of some unspecified amount of fossil fuels by "mobile offshore drilling units" ("MODUs"), Suppl. Not. of Rem. ¶ 27, does not transform the State's state law tort claims into claims under admiralty law. Whether or not MODUs, or even traditional fixed drilling platforms "underway to a drilling operation," *id.* ¶ 28, are "vessels" within the meaning of Section 30101(a), there is no allegation in the Complaint, nor have Defendants contended, that those "vessels" *caused* the injuries on land. As alleged, the proximate cause of the State's injuries is the defects in the products themselves and Defendants' promotion of those products with knowledge of their dangers, not from any Defendants' MODU operations.

### 3. The Claims Have No Substantial Relationship to Traditional Maritime Activity.

Marathon also fails to satisfy *Grubart's* "connection to maritime activity" test. 513 U.S. at 534. As the Supreme Court has recognized, the "law of admiralty has evolved over many centuries, designed and molded to handle problems of *vessels*," e.g., navigational rules, seaworthiness of ships, maritime liens, and cargo damage. *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 269–70 (1972) (emphasis added). The key inquiry is whether the allegedly tortious activity is "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply." *Grubart*, 513 U.S. at 539–40. In other words, the traditional maritime activity must be the "proximate cause of the incident." *Id.* at 541. Oil and gas production—even from MODUs—is not itself a "traditional maritime activity." In *Herb's*

63

*Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985), the Supreme Court concluded that the "exploration and development of the Continental Shelf are not themselves maritime commerce." Although *Herb's Welding* involved a fixed drilling platform, courts have extended this proposition to torts arising on "vessels" engaged in offshore oil and gas production, focusing on whether the specific injurious activity was related to a traditional subject of admiralty law, e.g. navigation.[31]

Defendants' limited MODU activities over the period of just a few years (Not. of Rem. ¶ 27) are not alleged to be the proximate cause of the State's injuries. Rather, the critical conduct at issue in the State's case is Defendants' marketing and promotion of fossil fuels, which has nothing to do with traditional maritime activity. Those land-based activities do "not require the special expertise of a court in admiralty as to navigation or water-based commerce." *Myhran v. Johns-Manville Corp.*, 741 F.2d 1119, 1122 (9th Cir. 1984).

## V.   CONCLUSION

The State's Complaint seeks relief exclusively under state law, and none of Defendants' laundry list of federal defenses supports removal jurisdiction. For the reasons explained above, and for those to be advanced at oral argument, the State's Complaint does not present subject matter jurisdiction over these state law claims, and this action should be remanded to the Rhode Island Superior Court.

---

[31] *See, e.g.*, *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760, 771 (5th Cir. 2006) (even claims involving an accident on a vessel constructing a drilling platform did not arise from "traditionally maritime activities"); *Barker*, 713 F.3d at 218 (in a personal injury case on a MODU, "the act which gave rise to the incident in question—in this case, replacing a casing over a well—was in furtherance of the non-maritime activity of offshore oil exploration and drilling." (Clement, J., concurring)).

Dated: August 17, 2018

**STATE OF RHODE ISLAND**
PETER F. KILMARTIN, ATTORNEY GENERAL
By his Attorneys,


*/s/ Neil F.X. Kelly*
Neil F.X. Kelly
Assistant Attorney General and Deputy Chief of the Civil Division (Bar No. 4515)

Rebecca Partington
Assistant Attorney General and Chief of the Civil Division (Bar No. 3890)

**DEPARTMENT OF THE ATTORNEY GENERAL**

150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
nkelly@riag.ri.gov
rpartington@riag.ri.gov


Victor M. Sher, *pro hac vice*
Matthew K. Edling, *pro hac vice*

**SHER EDLING LLP**

100 Montgomery Street, Suite 1410
San Francisco, CA 94104
Tel: (628) 231-2500
vic@sheredling.com
matt@sheredling.com

65

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2018, the foregoing document was filed electronically and is available for viewing and downloading through the ECF system. Notice of this filing will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

/s/ Neil F.X. Kelly
Neil F.X. Kelly

John A. Tarantino
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
Fax: 351-4607
Email: jtarantino@apslaw.com

Nicole J. Benjamin
Adler, Pollock & Sheehan, PC
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
351-4607 (fax)
nbenjamin@apslaw.com

Philip H. Curtis
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-8000
212-836-8689 (fax)
philip.curtis@arnoldporter.com

Patricia K. Rocha
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
274-7200
Fax: 351-4607
Email: procha@apslaw.com

Matthew T. Heartney
Arnold & Porter Kaye Scholer LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
213-243-4000
Fax: 213-243-4199
Email:
matthew.heartney@arnoldporter.com

Nancy G. Milburn
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-8000
Fax: 212-836-8689
Email: nancy.milburn@arnoldporter.com

*Attorneys for Defendant BP Products North America, Inc.*

66

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7804
213-229-6804 (fax)
tboutrous@gibsondunn.com

Gerald J. Petros
Robin-Lee Main
Ryan M. Gainor
Hinckley Allen & Snyder
100 Westminster Street
Suite 1500
Providence, RI 02903-0819
274-2000
Fax: 277-9600
Email: gpetros@hinckleyallen.com
Email: rmain@hinckleyallen.com
Email: rgainor@hinckleyallen.com

Joshua S. Lipshutz
Gibson, Dunn and Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
202-955-8217
Fax: 202-530-8217
Email: jlipshiz@gibsondunn.com

Neal S. Manne
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002
713-653-7827
Fax: 713-654-6666
Email: nmanne@susmangodfrey.com

*Attorneys for Defendant Chevron Corp.*
and *Chevron USA, Inc.*

Lauren Motola-Davis
Lewis Brisbois Bisgaard & Smith LLP
1 Turks Head Place
Suite 400
Providence, RI 02903
401-406-3313
Fax: 401-406-3312
Email:
Lauren.MotolaDavis@lewisbrisbois.com

Samuel A. Kennedy-Smith
Lewis, Brisbois, Bisgaard & Smith, LLP
1 Turks Head Place
Suite 400
Providence, RI 02903
617-861-7974
Email: samuel.kennedy-
smith@lewisbrisbois.com

*Attorneys for Lukeoil Pan Americas LLC*

Jeffrey B. Pine
Lynch & Pine, Attorneys at Law
One Park Row
Fifth Floor
Providence, RI 02903
401-274-4400
Fax: 401-274-3326
Email: jpine@lynchpine.com

*Attorney for Marathon Oil Corporation*

Robert D. Fine
Chace, Ruttenberg & Freedman, LLP
One Park Row
Suite 300
Providence, RI 02093
453-6400
Fax: 453-6411
Email: rfine@crfllp.com

67

David C. Frederick
Kellogg, Hansen, Todd, Figel &
Frederick, PLLC
1615 M Street NW
Suite 400
Washington, DC 20036
202-326-7900
Fax: 202-326-7999
Email: dfrederick@kellogghansen.com

Elizabeth A. Kim
Jerome C. Roth
Munger, Tolles & Olson, LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
415-512-4010
Fax: 415-664-6910
Email: elizabeth.kim@mto.com
Email: jerome.roth@mto.com

Douglas J. Emanuel
Chace, Ruttenberg & Freedman, LLP
One Park Row
Suite 300
Providence, RI 02093
453-6400
Fax: 453-6411
Email: demanuel@crfllp.com

*Attorneys for Defendant Shell Oil
Products Company, LLC*

Ann Marie Mortimer
Hunton Andrews Kurth LLP
550 South Hope Street
Suite 2000
Los Angeles, CA 90071
(213) 532-2103
Fax: (213) 312-4752
Email: AMortimer@HuntonAK.com

Jeffrey B. Pine
Lynch & Pine, Attorneys at Law
One Park Row
Fifth Floor
Providence, RI 02903
401-274-4400
Fax: 401-274-3326
Email: jpine@lynchpine.com

Shannon S. Broome
Hunton Andrews Kurth LLP
50 California Street
San Francisco, CA 94111
415-975-3718
Fax: 415-975-3701
Email: SBroome@HuntonAK.com
Shawn Patrick Regan
Hunton Andrews Kurth LLP
200 Park Abenue
New York, NY 10166
212-309-1046
Fax: 212-309-1100
Email: SRegan@HuntonAK.com

*Attorneys for Marathon Petroleum Corp.,
Marathon Petroleum Company, LP* and
*Speedway, LLC*

68